SAM MACRI & SONS, INC., a corporation, and Continental Casualty Company, a corporation, Appellants,

v.

U. S. A. for the Use of OAKS CONSTRUCTION COMPANY et al., Appellees.

No. 17934.

United States Court of Appeals Ninth Circuit.

Jan. 7, 1963.

John E. Manders, Anchorage, Alaska, for appellant Sam Macri & Sons, Inc., and Continental Casualty Co.

Arthur Grunbaum, Seattle, Wash., for appellant Continental Casualty Co.

Shuler, Sayre, Winfree & Rankin, and Robert L. Myers, Portland, Or., for appellant Sam Macri & Sons, Inc.

Connolly & Walton, Anchorage, Alaska and Allen, Degarmo & Leedy, and Stuart G. Oles, Seattle, Wash., for appellee.

Before MERRILL, BROWNING and DUNIWAY, Circuit Judges.

DUNIWAY, Circuit Judge.

This is an action under the Miller Act (40 U.S.C. §§ 270a, 270b). Oaks Construction Company ("Oaks") was a subcontractor and was plaintiff in the trial court and is appellee and cross-appellant here. American Automobile Insurance Co. was a co-plaintiff. It is an assignee of Oaks, and since its rights as such are not questioned, it will not be mentioned further. Sam Macri & Sons, Inc., ("Macri") was general contractor and defendant in the trial court, and Continental Casualty Company ("Continental") is Macri's surety and co-defendant. Macri also cross-complained against Oaks. Macri and Continental appeal from a judgment for Oaks and against them, and Macri also appeals from that portion of the judgment which denies it relief on its cross-complaint. Oaks' cross-appeal is from the part of the judgment awarding Macri certain of the relief demanded in its cross-complaint. Certain other parties will be mentioned later. We conclude that the judgment should be affirmed in its entirety.

The action arises out of a dispute regarding performance of a contract for the construction of outside utilities, road, street and sidewalk paving, and storm drainage at Elmendorf Air Force Base, Alaska, and a subcontract for performance of part of the work, primarily grading and excavation. Oaks' claim was for labor and materials, principally so-called "extras," done by it, and the major dispute is as to whether the work was "extra," and, if so, the price to be paid for it. Macri's cross-complaint was for damages for improper performance and delay, in a sum exceeding an amount otherwise conceded to be owing to Oaks.

The trial court made detailed findings of fact, and we will consider them further in connection with the contentions of the parties. In summarizing evidence, we state only what supports the findings.

I. *The appeal of Macri and Continental.*

A. *The contention that the work involved was not extra.*

The trial court found that there was a net sum due Oaks under the contract of $96,992.80. It further found that during the work the Corps of Engineers requested from Macri proposals for extra work not within the scope of either Macri's prime contract or Oaks' subcontract, that each time Macri requested a proposal for such work from Oaks, Oaks made a proposal, in each case on a unit price basis, and, at Macri's direction, did the work. It further found that it was understood that settlement of compensation for the work would be made later; that

Macri and the Corps of Engineers, in December, 1955, did make a settlement, but that the unit prices Macri was to pay Oaks were not settled; and that the prices quoted by Oaks were "not more than the reasonable value of the services performed * * * and were fair and reasonable." The total of these "extras" is $34,888.82. It also found that Oaks did substantial work, at Macri's request, on areas designated "pave on existing grade," that this work was not called for by Oaks' subcontract, and that Oaks was entitled to be paid the value of the work, $37,932.26. It found that there were delays, some caused by Oaks and some by the Corps of Engineers, that the total damage to Macri by reason of delay was $36,613.50, and that one-half should be charged to Oaks. The judgment is for the sum of the first three figures, less one-half of the fourth.

Macri attacks these findings, the argument being based primarily upon the terms of the prime contract and of the subcontract. The prime contract, as is customary, embodies by reference detailed specifications and drawings. It lists 25 categories of work, with "estimated quantities" and unit prices for each. The subcontract covers several of these categories, but not including No. 4, "Leveling Course for Roads, Streets, Driveways and Parking Areas," nor any paving.

The specifications of the prime contract contain the following:

"SC-32 ESTIMATED QUANTITIES: The quantities listed in the Unit Price Schedule are estimates only. The Contractor will be required to complete the work specified herein in accordance with the contract and at the contract price or prices whether it involves quantities greater or less than the estimated quantities; provided that, should the actual quantity of work performed under any item vary from the estimated quantity by more than 25% an adjustment in the unit price for any such item shall be made on the following basis. * * *

In the event of a dispute as to the amount of any adjustment under this paragraph the matter shall be treated as a question of fact to be determined in accordance with the 'Disputes' articles of this contract."

The subcontract provides:

"It is understood and agreed that this subcontract is on a unit price basis and that quantities and amounts mentioned are approximate only and may be more or less at the same unit price and subject to change as directed by the owner and/or contractor, provided, however, that the unit prices shall be subject to adjustment as provided by paragraph SC-32 of the Special Conditions. The following unit price schedule will be the basis for payment for all work performed under this subcontract, subject to the provisions of paragraph SC-32. The quantities set forth are approximate only and payment will be made on the basis of actual quantities as determined by the owner."

It further provides:

"The contractor's engineer will do all necessary engineering and in consideration thereof the contractor will deduct from the contract price 2½¢ per cu. yd. of all excavating and borrowing involved in this subcontract."

Regarding extra work, the provisions of the subcontract are:

"(d) The CONTRACTOR may, without invalidating this SUBCONTRACT, order extra work or make changes by altering, adding to, or deducting from the work; the price herein being adjusted accordingly. All such work shall be executed under the conditions hereof, and of the MAIN CONTRACT, except that any claim for extension of time caused thereby must be agreed upon at the time of ordering such change.

"(e) To make no claims for extras unless the same shall be fully agreed upon in writing by the CON-

TRACTOR prior to the performance of any such extra work."

"12—It is understood and agreed that the provisions of the Special Conditions issued by the Corps of Engineers for contract Eng-95-507-54-6, and particularly paragraph SC-32, providing that if the actual quantities of work vary from the estimate be [sic] more than 25%, an adjustment in prices will be made as provided in said paragraph SC-32, which is made a part of this subcontract."

The corresponding provisions of the prime contract read:

"3. CHANGES AND EXTRAS. —The contracting officer may at any time, in writing, and without notice to the sureties, order extras or make changes in the drawings and/or specifications of this contract providing such extras or changes are within the general scope thereof. If any such extra or change causes an increase or decrease in the amount due under this contract, or in the time required for its performance, an equitable adjustment shall be made and the contract shall be modified in writing accordingly. Any claim of the contractor for adjustment under this Clause must be asserted in writing within 30 days from the date of receipt by the contractor of the notification of extra or change: Provided, however, That the contracting officer, if he decides that the facts justify such action, may receive, and act upon any such claim asserted at any time prior to the date of final settlement of the contract. If the parties fail to agree upon the adjustment to be made the dispute shall be determined as provided in Clause 6 hereof. But nothing provided in this clause shall excuse the contractor from proceeding with the prosecution of the work as changed."

Clause 6, mentioned above, is the usual "disputes" clause, and deals with "any dispute concerning a question of fact

arising under this contract," i. e., the prime contract.

As we have seen, the "extras" involved here are of two kinds, and we first consider the item involving areas marked on the drawings "pave on existing grade." Another subcontractor was to do the paving, and Macri itself was to do sidewalks and gutters. Mr. Oaks, a partner in Oaks, testified that in bidding, Oaks assumed that the grading was already done on those areas marked "pave on existing grade," so that Oaks was not to do any work on them, and our examination of the documents and the evidence leads us to the conclusion that this assumption was warranted. Oaks' testimony was supported by that of an experienced construction engineer. In essence, the testimony is that this work was included in item 4, leveling courses, etc., on which Oaks did not bid. The finding that this work was "extra" is not clearly erroneous—it was included in Macri's prime contract, but not in the subcontract of Oaks. Macri, however, required Oaks to do it.

As to the other "extra" work, we think it particularly significant that both the government and Macri treated each item as extra. In each case, the government requested a proposal from Macri; Macri requested a proposal from Oaks; Oaks made a proposal naming prices; Macri thereafter made a proposal to the government, again naming prices, and the government finally issued a "change order" for the work, each change order being designated by a number. Here involved are Nos. Eng. 18, 19, 21 and 23. Mr. Oaks testified that, to determine what specific work is to be performed, one must look at the drawings incorporated in the prime contract by reference. He said that the items of work covered by the extras involved were not shown on the drawings; in other words, they were not within the scope of the contract. The court agreed, and we cannot hold that it misconstrued the contract.

Macri contends that, because the prime and subcontracts are "unit price" con-

tracts, there can be no "extras," and it points to the language that we have already quoted from both contracts. It says that these provisions contemplate that additional work may be required, and that unless the additional work is of a different character from that called for in the contract, it cannot be "extra." It then says that all of the work involved was of the same character—i. e., excavation, fill and backfill—as that required by the contract; hence, it says, the work was not "extra."

■ We think, however, that the trial court could construe the contract language more narrowly, as it did. The language relating to unit prices speaks of "quantities" and "amounts," not of extra work, which is covered in the subcontract by a separate provision, also quoted above. Thus the unit price provisions can be construed as referring to the quantities involved in doing the work shown by the drawings. It could easily be, and it proved to be the fact, that the actual quantities involved in doing that precise work would prove to be greater or less, by substantial amounts, than the estimated quantities shown in the contract, and we think that it was this possibility that was provided for. No doubt, both Macri and Oaks bid on this basis. But how could either of them bid intelligently if the bid is also taken to include unspecified additional work, not shown on the drawings? (See Wunderlich Contracting Co. v. United States ex rel. Reischel & Cottrell, 10 Cir., 1957, 240 F.2d 201, 205, cert. denied, 1957, 353 U.S. 950, 77 S.Ct. 861, 1 L.Ed.2d 859) Both the estimated quantities and the nature of the terrain to be worked must be considered if an intelligent bid is to be made. If the provision, which was not drawn by Oaks, was intended to apply to additional "quantities" or "amounts" required by "extras," it could easily have been drawn to say so.

■■ The parties' own conduct, at the time that the extra work was ordered, confirms this view. Why else did the government and Macri ask for prices; why else did Oaks submit prices to Macri, and Macri submit prices to the government? It is well settled that where, as here, the language of the contract is not entirely clear, the conduct of the parties is given great weight in construing it. (Holbrook v. Petrol Corp., 9 Cir., 1940, 111 F.2d 967, 969; Pacific Portland Cement Co. v. Food Machinery & Chemical Corp., 9 Cir., 1950, 178 F.2d 541, 554; Frank T. Hickey, Inc. v. Los Angeles Jewish Community Council, 1954, 128 Cal.App.2d 676, 683, 276 P.2d 52, 58.) The rule is so universally applied that we are confident that it is the law in Alaska.[1]

The language of the contracts in the cases upon which Macri most heavily relies (Lichter v. Westinghouse Electric

1. We assume that, in accordance with frequent pronouncements by the Supreme Court and by this Court, the prime contract, being a contract with the government, is governed by federal law. (See, e.g., Ivanhoe Irrigation Dist. v. McCracken, 1958, 357 U.S. 275, 289, 78 S.Ct. 1174, 2 L.Ed.2d 1313; United States v. Matthews, 9 Cir., 1957, 244 F.2d 626, 628; Liebman v. United States, 9 Cir., 1946, 153 F.2d 350, 352; United States v. View Crest Garden Apts., Inc., 9 Cir., 1959, 268 F.2d 380, 382, cert. denied, 1959, 361 U.S. 884, 80 S.Ct. 156, 4 L.Ed. 2d 120.) We have heretofore held that a subcontract, being between private parties, is governed by state law in a case such as this. (Continental Cas. Co. v. Schaefer, 9 Cir., 1949, 173 F.2d 5, 7, cert. denied, 1949, 337 U.S. 940, 69 S.Ct. 1517, 93 L.Ed. 17, 45; Central Steel Erection Co. v. Will, 9 Cir., 1962, 304 F.2d 548, 554). However, we do not expressly distinguish between federal and state law in this opinion, because we think that the principles that we apply are valid "federal" principles and are likewise valid under Alaska law. For our present purposes, it does not matter whether Alaska law be applied by analogy to the rule in Erie Ry. Co. v. Tompkins, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, the theory in Continental Cas. Co. v. Schaefer, supra, or is selected as our choice of the applicable federal rule (see United States v. View Crest Garden Apts., Inc., supra).

Mfg. Co., 6 Cir., 1944, 140 F.2d 597; City of Baton Rouge v. Robinson, 5 Cir., 1942, 127 F.2d 693, cert. denied, 1942, 317 U.S. 649, 63 S.Ct. 43, 87 L.Ed. 522) does what the language in the present contract does not do, i. e., makes it clear that the unit price provision applies to extra work, not just to variances in quantities of the contract work.

■■ What we have said also disposes of the next contention, namely, that even if the work done by Oaks was "extra," it was still to be paid for at the unit prices specified in the subcontract. (The $96,892.80 figure, mentioned above, includes the subcontract unit prices for all the work done, including "extra" work other than "pave on existing grade," and is conceded by Macri to be owing, subject to Macri's counterclaim, although Macri does not concede that any of the work was "extra.") The contention cannot apply to the work done in the areas marked on the plans "pave on existing grade." This work was not bid on by Oaks, but was the work of another subcontractor. It would certainly be going too far to extend the unit price provisions of Oaks' subcontract to this work. Nor do we think that the unit prices govern the other extra work. The general rule, which we think Alaska would apply, is that unless the contract specified prices for extra work (and we have held that here the unit price provision does not apply to extras), it is to be paid for on a quantum meruit basis. (Continental Cas. Co. v. Schaefer, 9 Cir., 1949, 173 F. 2d 5, cert. denied, 1949, 337 U.S. 940, 69 S.Ct. 1517, 93 L.Ed. 1745, where Macri was also the general contractor; Wunderlich Contracting Co. v. United States, supra; Central Steel Erection Co. v. Will, 9 Cir., 1962, 304 F.2d 548, 552; Fanderlik-Locke Co. v. United States for Use of Morgan, 10 Cir., 1960, 285 F.2d 939, 946, cert. denied, 1961, 365 U.S. 860, 81 S.Ct. 826, 5 L.Ed.2d 823)

■ Here, in each instance, after Macri asked Oaks for a proposal as to the contemplated extra work, it instructed Oaks to proceed. There was no ex-press agreement to pay the price proposed; this is conceded. But the recovery was on quantum meruit, and that is the correct basis, no price having been agreed to.

B. *The contention that the findings as to quantities and reasonable value are not supported by the evidence.*

■ The contention as to reasonable value is without merit. The findings are supported both by the testimony of Mr. Oaks and by that of an experienced contractor. The contention as to quantities involved in extra work, other than "pave on existing grade," is based largely upon an attack upon the admissibility of certain evidence, which we discuss later in this opinion. The evidence, if admissible, was sufficient.

The record as to the quantity of work done, designated as "pave on existing grade," is somewhat different. Oaks' claim is on a per square yard basis for the area of work that he did. The number of square yards upon which the claim is based is 64,292. It is referred to in the record as "Claim F." The drawings show over 250,000 square yards of such area. Mr. Oaks testified that Oaks kept no records of quantities handled by it, and that it was understood that Oaks was not to do so, as this would be done both by the resident engineer and by Macri. This was part of the engineering for which a deduction from monies owing to Oaks was made by Macri under a provision of the subcontract heretofore quoted. As a result, the quantity could be determined only from government records or from Macri's records. In response to interrogatories by Oaks, Macri had stated: "The records with reference to this contract are presently not available, and for the most part are in Anchorage, and it is believed that the plaintiffs (Oaks) have copies or information with reference to all of the modifications to the prime contract, or can obtain such information from the Corps of Engineers, United States Army." It also stated: "That the files and records are not presently in the possession of * * * [Macri] and are unavailable due to the

closing of operations by * * * [Macri] in Anchorage, Alaska, and no one being in Anchorage, Alaska, representing that company at this time," and "[t]he correspondence files of * * * [Macri] are scattered and it is impossible to state exactly where such files are at the present time. Most of the files are probably in Anchorage, Alaska, but * * * [Macri] has suffered financial reverses and are [sic] no longer in business and there is no one employed by * * * [Macri] capable of locating such records and files in Anchorage at this time. Duplicate copies of some of the correspondence may be in the possession of the attorneys for * * * [Macri]." So far as appears, Oaks never got access to any of Macri's records.

Mr. Oaks did testify that Oaks did work on "pave on existing grade" areas —"in excess of five miles of streets" and "a considerable number of parking lots." He also said that a study had been made by his engineer, Mr. Stiles, who had since died and that "the figure," (presumably the figure in Claim F) came from records of the Corps of Engineers.

Oaks employed an experienced engineer, Spernak, to dig the necessary information out of the government's files. He did so, at the District Engineer's Building on Government Hill in Anchorage. He went through six or seven file cases of records, including correspondence, computation of quantities, survey notes, both original and cross-section, and computed various quantities as a check. He stated that the claim of Oaks was for much less area than the total area shown as "pave on existing grade" on the drawings, and that the claim represents "those areas where no materials were given credit for; that is, the survey quantities wouldn't show any appreciable difference in the road or the parking area * * *. In other words, it was graded and compacted. The materials that were in that area at the time were just reshuffled * * * this Claim F is for work performed in areas where no credit is given for excavation or fill." He testified on cross-examina-tion that the 64,292 square yards is not his figure, but that it could be re-established from the government records, that he did find that Oaks did work on all of the streets marked "pave on existing grade," although he could not tell whether Oaks worked on the entire area of each street, and that he could not testify as to the accuracy of the figure.

On the basis of the foregoing Macri contends that the finding that Oaks performed the work in question on 64,292 square yards of the "pave on existing grade" streets is without any support in the evidence. If this were the usual case, in which the necessary evidence was or should have been in Oaks' possession, we might agree. But in this case, we do not. The Oaks' employee who ascertained the figure from government records is dead. Spernak's testimony indicates that such a figure could be derived from the records. The only party to this action who had any pertinent records was Macri, and those records were not produced, nor did Macri attempt in any way to show that the figure was incorrect. Under the unusual facts of this case, we hold that Oaks had made a sufficient showing to bring into play the rule applied in Fleming v. Harrison, 8 Cir., 1947, 162 F.2d 789, 792:

"The applicable rule is stated in Selma, Rome and Dalton Railroad Co. v. United States, 139 U.S. 560, 567, 568, 11 S.Ct. 638, 640, 35 L.Ed. 266, as follows: ' * * * While the general rule is that the burden of proof is where the pleadings place it, namely upon the party against whom judgment must go, if no evidence whatever is introduced, its application is often affected by circumstances. "From the very nature of the question in dispute," says Mr. Best, "all, or nearly all, the evidence that could be adduced respecting it must be in the possession of, or be easily attainable by, one of the contending parties, who accordingly could at once put an end to litigation by producing that evidence; while requiring his adversary to es-

tablish his case, because the affirmative lay on him, or because there was a presumption of law against him, would, if not amounting to injustice, at least be productive of expense and delay. In order to prevent this, it has been established as a general rule of evidence that the burden of proof lies on the person who wishes to support his case by a particular fact which lies more peculiarly within his knowledge, or of which he is supposed to be cognizant." ' " [2]

We discuss the propriety of the use of government records later in this opinion.

C. *The contention that Oaks is bound by the determination of the government's contracting officer that Oaks was not entitled to compensation above the unit prices established in the subcontract.*

The short answer to this contention is that there is no such determination. The most that the record shows is that the contracting officer denied any such compensation to Macri. Nowhere is there any determination by the contracting officer as to the compensation to be paid by Macri to Oaks. We would be very much surprised if there were such a determination. Oaks did not contract with the government, but with Macri. The unit prices in Macri's prime contract with the government are all higher than those in Oaks' subcontract with Macri. The price to be paid Oaks by Macri was not governed by the prime contract, and was no concern of the contracting officer. (See Central Steel Erection Co. v. Will, supra at 551; Fanderlik-Locke Co. v. United States, supra at 942) Perhaps Oaks and Macri could, by agreement, have submitted this matter to the contracting officer as an arbitrator. But there is no evidence that they did.

 No work is involved for which Macri was not paid by the government. Oaks concedes, whether cor-

rectly or not we need not say, that if the government had determined, under the disputes clause of the prime contract, that some of the work for which Oaks now claims compensation was not to be paid for at all, because not called for by the prime contract or any change order, we would have a different question, since Oaks agreed to be bound by the prime contract, and it contains a disputes clause giving finality to decisions made under it. But the price to be paid by Macri to Oaks for any authorized work is not one of the terms of the prime contract, and so a dispute between Macri and Oaks about that price is not within the disputes clause of the prime contract. Nor is the question as to whether work on "pave on existing grade" areas is governed by the subcontract of Oaks or by some other subcontract covered by any term of the prime contract. Hence, again, that question is not within the disputes clause of the prime contract, and the government's rejection of Macri's claim for this work as "extra" under the prime contract does not in any way decide whether the same work is "extra" under Oaks' subcontract.

 It is also claimed that, at a meeting between representatives of Macri and the government, at which Oaks' Mr. Stiles (deceased at the time of trial) was present, the quantities of work done and the prices to be paid were agreed to. This meeting was on December 8 and 9, 1955. It is certainly true that quantities and prices were agreed upon as between Macri and the government. These were embodied in a change order called Modification No. 22, dated May 2, 1956, and signed by the contracting officer, Macri, and Continental. But the evidence does not compel a finding that Mr. Stiles, for Oaks, agreed, or was authorized to agree, as to anything but quantities. The government would not be concerned with prices as between Macri and Oaks, so that this subject would not necessarily have been considered at the meeting. The court's finding

---

2. Cf. G. E. J. Corp. v. Uranium Aire, Inc., 9 Cir., 1962, 311 F.2d 749.

that these prices were not settled at the meeting is supported by the evidence.

D. *The contention that Oaks waived its claim to extra compensation.*

■ This contention is largely based on the theory that Oaks agreed to unit prices for the work at the December, 1955, meeting except as to "pave on existing grade" work, and that the claim for the latter work was waived. The court found to the contrary, and the finding is supported by the evidence.

E. *The contention that Macri did not waive the subcontract provisions as to extras.*

■ This contention is based upon the provisions of the subcontract relating to extras, heretofore quoted. It is true that there was no written agreement signed by Macri prior to the doing of the work. It is also true, however, that either after or at the time that Oaks submitted proposals for the work, Macri instructed Oaks to proceed, without either agreeing to or rejecting the proposal, and that Oaks did proceed. The provisions of the contract were for Macri's protection and could be waived by Macri. (Continental Cas. Co. v. Schaefer, supra at 8 of 173 F.2d) The court found that there was a waiver by Macri, and the evidence fully sustains the finding.

F. *The claim that evidence was improperly admitted or rejected.*

1. *Exhibit X.* This exhibit was produced by the witness Spernak, from the government files. It consists of two large columnar work sheets, headed "DA 560" (the number of the prime contract) and "Final Agreed quantities, 14 Dec. '55, R.B.M." Spernak testified that he ascertained from the files that the first of these two sheets showed what quantities had been agreed upon at the December 8-9, 1955 meeting, in relation to the work other than "pave on existing grade" for which Oaks claimed extra compensation. The figures there appearing are the figures found by the court to be correct.

The total quantities of material handled under the contract headings "1. Excavation * * *" and "2. Classified fill." admittedly are correctly shown in "Modification No. 22," already mentioned. It was, however, still necessary for Oaks to show what parts of those totals were done in the areas, where, as he claimed, the work was "extra." This is the information appearing on the first sheet of Exhibit X. We have examined this document with some care, and when considered in connection with Macri's admission that it came from the government files, it appears to us to be almost "self proving," containing, as it does, so far as it relates to matters here in issue, a list of the "Eng" numbers for the "extras," the locations, the quantities, and notations as to the sources of the figures. When there is added Spernak's testimony, which is, in substance, that he examined sufficient other documents, of the types heretofore mentioned, to satisfy himself that the quantities shown are those arrived at in the meeting and embodied in "Modification No. 22," the authenticity of the document is hardly open to question.

It is argued that the exhibit is both a "record of account" and a "minute" of government proceedings within 28 U.S.C. § 1733, or a "writing * * * made as a memorandum or record of [an] act, transaction, occurrence, or event" within 28 U.S.C. § 1732, which deals with business records. The fact that the date on the paper is five days after the event does not prevent this conclusion, especially when the matter is considered in the light of the rest of Spernak's testimony. Nor does the fact that Spernak found two additional sheets, attached to the two offered in evidence, but not produced at the trial, render the exhibit inadmissible as being only part of a document. He testified that those sheets contained no information pertinent to the specific matters here in issue.

■ But we need not hold that 28 U.S.C. §§ 1732 and 1733 are here applicable. It is long established that, where records are voluminous, a sum-

mary, either oral or written, may be received in evidence. Here, Spernak was a man of long experience in the business here involved, and knew the type of records that would contain the information sought. As his testimony shows, he verified his conclusion that Exhibit X did list the quantities agreed upon at the meeting from the other records that he examined. In effect, he made Exhibit X his own, and testified that the figures it contained showed the quantities handled in the doing of the extra work on which Oaks' claim rested. Thus his testimony is a summary of what the records show. Nor was Oaks required to bring the six or seven file drawers of records into court for Macri's use in cross-examination. It is enough if they were "within reach" of Macri. (See Greenbaum v. United States, 9 Cir., 1935, 80 F.2d 113, 121.) Here, the records were just as accessible to Macri as to Oaks. Macri, in its answers to Oaks' interrogatories, stated that the requested information could be obtained from the Corps of Engineers. This is just what Oaks did.

Macri made no showing that the records were not accessible to it or that it had ever taken the trouble to examine them, made no request for time in which to examine them in preparation for cross-examination, never produced its own records—records which, under the subcontract, it was to keep for the benefit of Oaks as well as its own benefit—and never presented any evidence whatever to refute the accuracy of the figures on Exhibit X. Under these circumstances, and for reasons we have already stated under heading I, B., supra, we think that the court properly received Spernak's testimony and, in connection with it, Exhibit X. If the facts were different, neither we nor the trial court might be so liberal. But we think that the time has gone by when, in a civil case, a party in Macri's position can keep to itself information bearing on its opponent's claim and, to defeat that claim, rest upon the difficulty that it has thereby helped to create.

2. We find no error in other evidentiary rulings complained of.

G. *The claim that the court erred in awarding Macri only half of its damages for delay.*

Without detailing the evidence, which is in rather sharp conflict, we think that the court could conclude, as it did, that the damage was caused in part by deficiencies in Oaks' performance and in part by numerous changes in the plans, and by errors in the plans, on the part of the government. The court also found that it could not, with any degree of accuracy, determine what part of the delay was caused by Oaks. It concluded that it was proper to award Macri one-half of certain of the damage claimed in its counterclaim. It rejected certain of Macri's testimony as to losses incurred, as it had a right to do. We think that there was no error. The rejected evidence related to the rental value of equipment held over for a second season, and to overhead. The court could have concluded that these expenses, if proved, would have been incurred had there been no delay caused by Oaks. The prime contract required completion of certain work by September 1, 1954, and the entire work by September 1, 1955. The principal complaints as to Oaks' performance related to 1954. Macri would have had to hold over equipment, and to continue to incur overhead, in any event.

H. *The claim that no interest should have been allowed until judgment.*

Interest on $95,871.62, the amount admitted to be owing to Oaks, was allowed from December 24, 1955, when the moneys became due. Macri says that this is improper because it had an unliquidated counterclaim, in a greater amount, against Oaks. However, the amount of the counterclaim actually sustained by the court was less than the amount of the judgment awarded for extras, over and above the $95,871.62. The court awarded interest on the difference, but only from the date of judgment. The $95,871.62 was essentially a liquidated claim, admittedly owing.

Oaks' other claims, and Macri's claim, were both unliquidated. The court treated one as an offset against the other. We think that the result is equitable, and within the general principles applied in Hunt Foods, Inc. v. Phillips, 9 Cir., 1957, 248 F.2d 23. The Alaska statute (Alaska Comp.Laws Ann. § 25–1–1 (1949) allowing interest does not differ in material respect from that of California, which we applied in Hunt Foods, Inc.

■ It is also urged that the surety is not liable for interest until demand upon it, citing American Auto Ins. Co. v. United States for Use and Benefit of Luce, 1 Cir., 1959, 269 F.2d 406. That case, however, applies Maine law, which, as the Court there indicated, is peculiar in this respect. Here, Oaks had a direct contractual relationship with Macri, so that 40 U.S.C. § 270b imposes no prerequisite of notice to anyone before suit against the surety. Thus it appears that the surety's liability coincides in time with that of the principal. We are not cited to anything in Alaska law to the contrary, or comparable to that of Maine.

*I. The claim that no attorneys' fees should have been allowed to Oaks.*

■ Such fees were allowable at the time of this judgment under Alaska law (Alaska Comp. Laws Ann. § 55–11–51 (1949); United States for Use and Benefit of Miller & Bentley Equipment Co. v. Kelly, D.C.Alaska, 1961, 192 F.Supp. 274, 279). We find no error. Here Oaks recovered the major part of its claim, and the case thus differs from Kelly, where the major part of the claim was defeated by a counterclaim, and the Court declined to award any fees.

*J. The claim that no judgment should have been awarded to Northern Commercial Company and Rogers.*

■ These parties were lien claimants against Oaks, and were named as defendants. The judgment, while it runs in their favor as against Macri and Continental, is not prejudicial to them. It provides that such judgments are concurrent with, and not in addition to, that of Oaks, which is awarded only the balance due after their judgments are satisfied. If there was error, it does appellants no harm.

*II. The appeal of Oaks.*

Oaks contends that no damages should have been awarded to Macri on its counterclaim. What we have said under heading I, G., supra, is, we think, a sufficient answer to this contention. Essentially, the matter is one of what evidence the court, as trier of the facts, decided to accept.

Affirmed.