**HENDRY CORPORATION, Appellant,**

v.

**AMERICAN DREDGING COMPANY and Federal Insurance Company, Appellees.**

No. 19791.

United States Court of Appeals
Fifth Circuit.

June 7, 1963.

Rehearing Denied July 22, 1963.

William S. Rodgers, Jr., Wm. Terrell Hodges, and Arthur A. Simpson, Tampa, Fla., Macfarlane, Ferguson, Allison & Kelly, Tampa, Fla., of counsel, for appellant.

William A. Gillen and Fowler, White, Gillen, Humkey & Trenam, Tampa, Fla., for appellees.

Before TUTTLE, Chief Judge, WOODBURY,* Chief Judge, and BELL, Circuit Judge.

WOODBURY, Chief Judge.*

Hendry Corporation, Hendry hereinafter, a Florida corporation, in its own name and in the name of the United States for its use and benefit, brought an action in the United States District Court for the Southern District of Florida in four counts against American Dredging Company and its insurer, Federal Insurance Company, American and Federal hereinafter, Pennsylvania and New Jersey corporations respectively, on a dredging contract. Counts I and III are predicated on the Miller Act. 40 U.S.C. § 270a et seq. Jurisdiction over the other two counts in which Federal was not named as a defendant is alleged to rest upon diversity of citizenship and amount in controversy, Title 28 U.S.C. § 1332(a)(1), and are to recover for breach of contract and in quantum meruit. After trial without a jury the court below entered judgment for Hendry and for the United States for Hendry's benefit against both defendants for an amount they admitted that they owed but not for the amount Hendry claimed, and Hendry in its own name filed timely notice of appeal.

At this point we come face to face with the appellees' motion to dismiss the appeal for lack of appellate jurisdiction for the reason that Hendry appealed in its own name instead of in the name of

* Chief Judge, First Circuit, sitting by designation.

the United States for Hendry's use and benefit. The argument is that since actions under the Miller Act must be brought in the name of the United States for the use of the person suing, so also must every appeal by an aggrieved plaintiff below be brought in the name of the United States for his use. Wherefore it is said that failure to appeal in that form requires dismissal for lack of appellate jurisdiction.

It is, of course, true that under § 270b (b) of 40 U.S.C. every suit instituted under the Miller Act must be brought in the name of the United States for the use of the person suing. The statute is silent, however, as to the form required for taking appeals and no authority on that point has been cited to us or otherwise come to our attention. We must embark on our own analysis.

While the statute requires that suits under the Act must be brought in the name of the United States for the use of the person suing, there is no requirement that leave to sue must first be obtained from the United States or even that it must be given notice of suit. Therefore counsel for Hendry properly acted on his own initiative in instituting the present action in which counsel for the United States entered no appearance, signed no papers and in no way participated, and the costs and expenses of which Hendry would have to bear if unsuccessful, for the statute expressly provides that the United States shall not be held liable for the payment of any costs or expenses of suit. Moreover the notice of appeal is captioned in the same terms as the complaint and, like the complaint, is signed only by counsel for Hendry. The only defect is the failure to describe Hendry as a use plaintiff in the body of the notice of appeal. This impresses us as merely a formal irregularity which, in the absence of any suggestion of prejudice, ought not to affect appellate jurisdiction. The appellees' motion to dismiss is denied.

The appellant says that it has no major quarrel with the district court's findings of fact which are as follows.

In February 1959 American entered into a direct or prime contract with the United States Army Corps of Engineers for the enlargement by dredging of the Alafia River channel and turning basin in Tampa Harbor, Florida. In connection with that contract it, as principal, and Federal, as surety, furnished the bond required by the Miller Act conditioned upon the payment by American of all persons supplying labor and materials in the prosecution of the work provided for in the contract.

At the time American submitted its bid for the prime contract its dredge "Philadelphia," with which it hoped to do the work, was engaged in dredging operations in Pensacola, Florida, and would not be available to start the Alafia River project within the time required. Wherefore, before American submitted its bid for the prime contract, it approached Hendry, which had a dredge immediately available, and the two tentatively agreed that if American should be the successful bidder Hendry would immediately undertake part of the job as a subcontractor, and they also tentatively agreed as to how the work should be divided between them. The court found, it said on uncontradicted evidence, "that it was the expressed intention of the parties that the work to be performed by each under the subcontract should be so divided as to give each party an opportunity to earn 50% of the total estimated price which was to be paid under the prime contract." And, in furtherance of this understanding, American and Hendry agreed to submit a proposed line or station to serve as the dividing line of the work to be performed by each under the prime contract.[1] Hendry submitted Station 137 as its proposed dividing line and American as its proposed dividing line submitted Station 132 plus 22 feet.

1. The project as submitted for bid by the Corps of Engineers was divided into 100-foot segments called stations numbered along the channel from the project's western terminus to the turning basin at its eastern terminus.

The court below found that neither of the proposed stations would divide the work equally on the basis of the dollar value of the work to be done.[2] It found that under American's proposal the dollar value of the work to be done in the eastern section was $151,514 greater than the work to be done in the western section and that under Hendry's proposal the dollar value of the work to be done in the western section was $22,414 greater than the work to be done in the eastern section.[3] However, the court below found: "The parties, in spite of this discrepancy in the dollar value of the work then known to be available on each side of the dividing line proposed by them, respectively, expressed their willingness to do the work on either side for one-half of the money which could be earned under the prime contract."

We are somewhat at a loss to understand the pertinence of this finding, for undoubtedly neither party held out for its position. The court below found that after discussion the parties agreed to make the dividing line the mid-point between the two proposed stations, which were 476 feet apart, that is to say, at Station 134 plus 61 feet, and then drew lots to determine which side of the line each would dredge. Hendry drew the easterly side and American drew the westerly side. The court found that this line also did not divide the dollar value of the work equally inasmuch as the work east of the line was worth $66,548.80 more than the work west of it. Nevertheless the court found that each party agreed to do the portion of the work it had selected by lot for one-half of the total money to be earned under the contract.

At this juncture, on May 8, 1959, American and Hendry entered into the written contract which is the subject matter of this litigation. In it Hendry agreed to perform all work called for in the prime contract "between the easterly end of the work, as shown upon the said [Corps of Engineers'] drawings, and Station 134 plus 61 or such alteration of that station as may be made pursuant to the terms of this agreement" and American undertook "to perform under its contract with the Corps of Engineers all work West of Station 134 plus 61 or such other station as may be agreed upon pursuant to the provisions of this agreement." The contract recited:

"The parties have so divided the work as to make it possible for each party, by performing all of the work within its area, as estimated by the Corps of Engineers in accordance with the pre-dredging surveys, including removal of 100% of the over-depth and side slope allowable and to be paid for by the Government, to earn 50% of the total estimated price for dredging which total estimated price amounts to $2,471,-960.00."[4]

The contract specifies that this figure does not include the sum of $80,000 provided in the prime contract for mobilization and demobilization of equipment, which the parties by agreement divided

2. American's bid and the prime contract as executed specified different unit prices for dredging different parts of the project, i.e., 36¢ per cubic yard dredged in the channel west of Station 87, 88¢ per cubic yard for dredging in the channel from Station 87 to Station 169 and $1.08 per cubic yard for dredging in the turning basin.

3. These figures are based on the only data then available to the parties, which was the government's pre-bid survey made some time before the project was let out to bid and which the parties knew to be only an estimate of the quantity to be dredged and subject to correction by soundings made at more frequent intervals as the dredging progressed.

4. The expressions "allowable overdepth" and "allowable side slope" refer to material lying one foot beyond the depth and slope specified in the prime contract. Removal of this excess material by the contractor was not required but if removed would be paid for. American and Hendry each excavated to the required depth and slope in its area but neither removed 100% of the allowable overdepth and side slope.

equally and as to which there is no dispute, and then the contract provides:

"The parties hereby agree that the lines separating the two sections of the work which is agreed to be at Station 134 plus 61, may be adjusted Eastward or Westward upon the following basis:

"(a) If pre-dredging soundings are at variance with the contract quantities, the line shall be moved so as to make it possible for each party, by removal of 100% of all allowable overdepth and side slope, to receive 50% of the total amount of the contract price less the $80,000.00 allowance for mobilization and demobilization.

\*    \*    \*    \*    \*    \*

"It is further agreed that if the pre-dredging soundings are at variance with the amounts as estimated in the contract, an adjustment of the line now established at Station 134 plus 61 shall be made so as to effectuate the intent of the parties as herein expressed."

Hendry began work with its dredge on the easterly end of the project on June 30, 1959, and worked through October 10, and American went to work on the westerly end of the project on September 8, 1959, and worked through February 1, 1960. As the work progressed the pre-dredging soundings showed that there were some 300,198 more cubic yards to be dredged than the pre-bid survey had indicated, which excess the court found represented a dollar increase in the prime contract price of $245,056.48. And, although both parties agreed that because of this variation between the pre-bid survey and the predredging soundings the dividing line between their work areas should be adjusted, they disagreed as to how the new dividing line should be fixed. American took the position that the dividing line should be moved so as to make it possible for each party to earn 50% of the value of the excess quantity disclosed by the pre-dredging soundings, which, according to

its calculations, would move the original dividing line at Station 134 plus 61 eastward 193 feet to Station 136 plus 54. Hendry, on the other hand, contended that the new dividing line should be fixed by applying the unit prices mentioned in the prime contract to the total amount of the material to be dredged as disclosed by the predredging soundings, thereby establishing a point which would equally divide all the money it was possible to earn under the prime contract. According to Hendry's contentions that line would fall at Station 138 plus 22.27 feet.

Each party advised the other of its position and American then notified Hendry that it would consider the latter in breach of its contract if it did not dredge from the eastern end of the project westward to American's dividing line at Station 136 plus 54. And American told Hendry that unless it acceded American would make no further payments to Hendry until the entire job was completed and American had been paid in full by the government, when it would pay Hendry any sum that might then be due. Under protest Hendry dredged west to the line demanded by American and then brought this suit to recover the amount it claims due under its method of calculation, which, it says, is $102,506.32. American admits that under its method of calculation it owes Hendry $69,309.00, which is the amount with interest awarded Hendry in the judgment appealed from and which American has paid. The dispute, therefore, is over the difference between these two sums, that is, $33,197.32.

There can be no doubt whatever that American and Hendry agreed on some basis to adjust the dividing line which they had reached by splitting the difference between the original dividing lines which each had proposed. Nor can there be any doubt that whatever adjustment might be made was to take into account the discrepancy that was sure to develop between the dollar value of the work as estimated in the pre-bid survey and the dollar value of the work as disclosed by the more accurate predredging sound-

ings. The question is whether the dividing line should be adjusted only so as to make it possible for each party to earn 50% of the value of the excess quantities disclosed by the predredging soundings, viz., 300,198 cubic yards amounting in value to $245,056.48, as American contends, or whether, as Hendry contends, the line should be adjusted to take into account not only the value of the 300,198 cubic yards but also the discrepancy that existed as a result of the compromise dividing line at Station 134 plus 61, to wit, a $66,548.80 difference which by lot fell into Hendry's eastern sector.

■ As to this the contract is certainly not as clear and unambiguous as it might have been. We agree with the lower court's conclusion that the contract "fails to expressly and clearly state how the new dividing line should be arrived at in the event there was a variance between the predredging surveys and the predredging soundings with regard to the work available under the prime contract." Therefore we conclude that the court below was not in error in taking parol evidence to resolve the ambiguity. The question is whether the court below correctly construed the contract in the light of that evidence.

The court below based its adoption of American's interpretation of the contract upon its finding that each party had agreed to do the portion of the work it had chosen by lot for one-half the total money to be earned under the prime contract, saying that otherwise selection of the compromise dividing line at Station 134 plus 61 would have no meaning. It said:

"A fair reading of said subcontract taken together with the evidence presented in this case compels the conclusion that the interpretation of the subcontract as set forth by American is correct and the adjustment of the dividing line as provided by said subcontract shall apply only to the excess work disclosed by the predredging soundings. At the time the subcontract was executed, the parties were very well aware

that Station #134 plus 61 did not in fact divide the work available under the prime contract equally—on a unit price basis—and that the value of the material available for dredging East of said dividing line agreed upon was $66,548.80 greater in value than the material available for dredging West of said dividing line agreed upon notwithstanding each of the parties expressed its willingness to do either side for one-half of the money paid by the Government for the entire project. The dividing line finally agreed upon was a compromise and the area to be dredged by each was selected by lot, each of the parties realizing that it might have to dredge more on a unit price basis than the other. It is clear, therefore, that the original division of the work was not intended to be and was not an equal division based upon the value, on a unit price basis, of the material required and allowed to be dredged. The selection of said dividing line at Station #134 plus 61 was not an idle and meaningless act, and it is clear, from the totality of the evidence, that it was not to be disregarded by the parties in the event the predredging soundings revealed more material for dredging than the quantity of material for dredging as shown by the predredging surveys."

■ We think the district court accorded more finality to the compromise dividing line fixed by the parties than the parties intended.

In the first place the court's finding of the parties' willingness to do the work on either side of the compromise dividing line for one-half of the money to be paid by the government for the entire project, when they well knew that the value of the work on one side of the line was substantially greater than the value of the work on the other, is at variance with the court's finding that the parties' basic intention was that the work to be done by each under the subcontract

should be so divided as to give each party an opportunity to earn 50% of the total estimated price to be paid under the prime contract. It seems inconsistent to say that the parties intended to divide the work so that each could earn half its value and then agreed to divide the work so that for the same money they would earn unequal shares. In the second place we think the court's finding is belied by the conduct of the parties in splitting the difference between their proposed dividing lines and then drawing lots to see which side of the compromise dividing line each was to dredge. Certainly the compromise dividing line was arrived at in a most casual fashion. And we think it most unlikely that businessmen would draw lots to see which side of the line each would take when they intended, as the court found, to divide the work to be performed by each under the subcontract so as to give each party an opportunity to earn 50% of the total estimated price to be paid under the prime contract, and knew that the estimated dollar value on a unit price basis of the work on one side of the line was worth sixty-odd thousand dollars more than the work on the other. We think it unlikely that businessmen would gamble for so large a stake. Instead it would appear that fixing the line at Station 134 plus 61 was only tentative so that it really made no difference which side of the line each was to dredge because the line was adjustable and sure to be moved so as to equalize the full value of the work to be done when more accurate data based upon predredging soundings became available.

In short, we cannot see why the parties did what they did unless they believed that their compromise dividing line was to be moved to a point which would effectuate their basic understanding that the work to be performed by each would be divided so that each could earn half the total price to be paid under the prime contract.

These considerations lead us to the conclusion that the parties must have intended that their compromise dividing line was to be moved not merely so as to make it possible for each to earn 50% of the value of the excess quantities disclosed by the predredging soundings, but so that, by application of the unit prices of the prime contract, each could earn one-half of the value of all the excavation to be done under the prime contract, thereby eliminating the sixty-six odd thousand dollar discrepancy known to exist as a result of the compromise dividing line at Station 134 plus 61. And this conclusion seems to us borne out by subparagraph (a) of the contract provision quoted herein above in which the parties agreed that in the event of variance between predredging soundings and contract quantities the dividing line was to be moved "so as to make it possible for each party * * * to receive 50% of the *total* amount of the contract price." (Emphasis supplied.)

We concede that our interpretation of the contract accords little significance to the parties' agreement to divide the work at Station 134 plus 61. But tentative agreement upon a dividing line somewhere was not altogether meaningless. Since one party was to begin work long before the other, they may well have thought it desirable to fix a tentative point of division. The contract is by no means as clear as it might have been. But on the whole we think it more likely that the parties intended to adjust the dividing line they tentatively agreed upon in such a way that each could earn half of all the money to be paid under the prime contract, not just half of the money to be paid for the excess work disclosed by the predredging soundings.

Judgment will be entered vacating the judgment of the District Court and remanding the case to that Court for further proceedings consistent with this opinion.