UNITED STATES of America, for the Use and Benefit of YARDLEY DRILLING COMPANY, Inc., a corporation, Plaintiff-Appellant,

v.

ERICKSON PAVING COMPANY and Associated Engineers & Contractors, Inc., Washington corporations, acting as Joint Venturers under the name and style of Stewart-Erickson, et al., Defendants-Appellees.

No. 71-2656.

United States Court of Appeals, Ninth Circuit.

June 26, 1972.

Thomas Malott (argued), of Malott, Keith & Southwell, Spokane, Wash., for appellant.

Stuart G. Oles (argued), of DeGarmo, Leedy, Oles & Morrison, Seattle, Wash., for appellees.

Before HAMLEY, HUFSTEDLER and GOODWIN, Circuit Judges.

HAMLEY, Circuit Judge:

This Miller Act (40 U.S.C. §§ 270a–270e) case involves a controversy between a prime contractor and its subcontractor as to the compensation the subcontractor is entitled to under a subcontract item covering drilling and shooting of solid rock, including all line drilling required.

The subcontractor, and use plaintiff, is Yardley Drilling Company, Inc., (Yardley). The principal defendants are Erickson Paving Company and Associated Engineers & Contractors, Inc., acting as joint venturers under the name and style of Stewart-Erickson.[1] The prime contract was between Stewart-Erickson and the United States Government, through the Department of the Army, Corps of Engineers. The prime contract covers "Grading of Camas Prairie Railroad; Purrington to Schultz Bar, Whitman County, Washington."

Under its contract with the Government, Stewart-Erickson undertook, among other things, to excavate an estimated 1,610,000 cubic yards of "unclassified" material for a unit price of eighty-four cents a cubic yard. Under Technical Provision 2–02 of the prime contract, "unclassified" included all materials regardless of their nature, including both bedrock and common materials. The quantity—1,610,000 cubic yards—was the Government's estimate of the amount of unclassified materials to be excavated within the design prism of the prime contract drawings, based upon the Government's exploratory data. In Technical Provision 2–01 of the prime contract, however, the Government gave notice that actual quantities for individual reaches might vary widely from the quantities indicated by the exploratory data and the design cross-sections.

In addition to the unclassified excavation within the design prism, paragraph 3 of the General Provisions of the prime contract, entitled "Changes," obligated Stewart-Erickson to do any additional excavation of unclassified material, within the general scope of the contract, required of it by the Government's Contracting Officer. Subparagraph (d) of paragraph 3 provided that if any change thereunder caused an increase or decrease in the contractor's cost, an equitable adjustment would be made.

Stewart-Erickson wished to subcontract out the rock work which might be encountered in excavating the unclassified materials. Preparatory to submitting its bid to the Government, Stewart-Erickson solicited a bid for this rock work from Yardley. On the basis of his examination of the project site and the contract documents including design cross-sections, Virgil N. Messenger, President of Yardley, gave Stewart-Erickson a telephoned bid of four hundred and ninety thousand dollars. This was on the assumption that, within the design prism, there would be some two hundred and forty-eight thousand lineal feet of line drilling (at one dollar per cubic yard), and about four hundred thousand cubic yards of solid rock to drill and shoot (for two hundred and forty-two thousand dollars). Some twenty minutes after this telephone call, Messenger again telephoned Stewart-Erickson and reduced his proposal to four hundred and fifty thousand dollars plus six thousand dollars for a D–6 bulldozer to be used in the work.

Yardley's telephoned proposal was neither accepted nor rejected by Stewart-Erickson at that time, but was utilized by it in preparing its bid on the prime contract. After the Government awarded the contract to Stewart-Erickson the latter and Yardley entered into negotia-

---

1. The sureties of the prime contractors are also named defendants.

tions for the subcontract. Since there was no provision in the prime contract for unit prices on drilling and shooting of solid rock, or on line drilling, it was necessary to relate Yardley's compensation to the progress payments to be received by Stewart-Erickson on unclassified excavation.

Yardley's four-hundred-and-fifty-six-thousand-dollar figure would be substantially realized if Stewart-Erickson paid Yardley twenty-eight cents per cubic yard on the estimated 1,610,000 cubic yards within the design prism, and Yardley first quoted a twenty-eight cent unit price. After negotiation Yardley reduced this to twenty-seven and a half cents. Thus if there turned out to be exactly 1,610,000 cubic yards of unclassified excavation within the design prism, as estimated, Yardley's compensation for such rock work would have been $442,750. The negotiated agreement as to Yardley's compensation was stated as follows in the subcontract:

"Item 1 Excavation, unclassified— Drilling and shooting of solid rock including all line drilling required at TWENTY-SEVEN and ONE-HALF CENTS ($0.275) per cubic yard."

The unclassified excavation within the design prism exceeded the estimated 1,610,000 cubic yards by thirty-seven cubic yards. This meant that, for its rock work within the design prism, Yardley received $442,760.18, or slightly more than its estimate of $442,750. The actual rock work performed by Yardley within that area, however, was substantially below its estimate of rock work required, upon which Yardley's bid was based. Only 129,679 lineal feet of line drilling was required, as compared to the two hundred and forty-eight thousand lineal feet Yardley had estimated. Only 331,503 cubic yards of rock were drilled and shot, as compared to Yardley's estimate of four hundred thousand cubic yards.

In addition to the 1,610,037 cubic yards of unclassified excavation Stew-art-Erickson did within the design prism, it was ordered by the Corps of Engineers to excavate 377,365 cubic yards of unclassified material outside that area. This additional excavation consisted of: (1) removal of materials below the grades indicated in the contract drawings and design cross-sections, due to encountering unsuitable materials at original excavation depth; (2) the addition of certain drainage ditching ordered by the Corps of Engineers; and (3) removal of materials outside the prism in the course of achieving stability by flattening the slopes shown in the design prism, made necessary because rock was not encountered as close to the surface as expected.

The Corps of Engineers paid Stew-art-Erickson at the rate of eighty-four cents per cubic yard for this additional excavation, the price being arrived at as the result of negotiation between the Corps of Engineers and Stewart-Erickson. Yardley did no rock work in connection with this additional excavation. Nor did Stewart-Erickson pay Yardley twenty-seven and one-half cents per cubic yard, or at all, on this additional unclassified excavation. Stewart-Erickson's position was that this additional excavation was performed outside the scope of the subcontract, and since it did not involve any rock work by Yardley, the subcontract did not contemplate that Yardley would be compensated therefor.

Yardley has not quarreled with this construction of the subcontract insofar as the first two kinds of additional excavation described above are concerned. But, after the subcontract had been completed, Yardley took the position, which it still maintains, that it was entitled to twenty-seven and one-half cents per cubic yard on the 307,376 cubic yards of unclassified excavation involved in the third kind of additional excavation described above (flattening the slopes outside the design prism). Since Yardley did no rock work in connection with this slope flattening, this additional compensation, amounting to $84,528.40 would,

under Yardley's theory, be part of its compensation for the rock work performed by Yardley within the design prism and for the obligation it assumed of doing, without other compensation, rock work which might have been (but was not) encountered in flattening the slopes.

Yardley brought this action to recover that sum. After a bench trial, the district court entered findings of fact and conclusions of law determining, in essence, that the subcontract clause providing for Yardley's compensation is ambiguous, and that a consideration of all the circumstances surrounding the agreement showed that Yardley was entitled to no additional compensation for the slope flattening done by Stewart-Erickson outside the design prism. The court therefore dismissed Yardley's action with prejudice, and Yardley appeals.

Appellant argues that the trial court erroneously concluded that the subcontract is ambiguous. Yardley contends that the agreement unambiguously entitles it to twenty-seven and one-half cents per cubic yard on the 307,376 cubic yards of additional excavation done entirely by Stewart-Erickson in flattening slopes outside the design prism.

For convenience of discussion we repeat Item I of the subcontract:

"Excavation, unclassified—Drilling and shooting of solid rock including all line drilling required at TWENTY-SEVEN and ONE-HALF CENTS ($0.275) per cubic yard."

It is uncertain from this language whether Yardley was to be paid twenty-seven and one-half cents per cubic yard on unclassified excavation to compensate it for any rock work which might be encountered regardless of the actual amount of such rock work, or whether it was to be paid that sum only on the yardage it actually drilled and shot during the course of the excavation of unclassified materials. The parties resolved this ambiguity in favor of the first of these possible constructions of the language, but only by recourse to circumstances not revealed in the subcontract or prime contract.

But this resolution of the described uncertainty gives rise to another ambiguity. If Yardley was to be paid twenty-seven and one-half cents per cubic yard on unclassified excavation regardless of the actual amount of rock work encountered in the course of such excavation, does the "excavation, unclassified," referred to in Item 1 of the subcontract include only the excavation of unclassified materials within the design prism, or does it include all such excavation ordered by the Contracting Officer, whether within or without the design prism?

This ambiguity cannot be resolved by looking at the subcontract alone, or at the subcontract and prime contract considered together.[2] It is true that Technical Provision 2–02 of the prime contract makes it clear that if excavation is required of Stewart-Erickson by the Corps of Engineers outside the design prism, such excavation shall be regarded as "unclassified," and that all unclassified excavation within or without the design prism shall include both bedrock and common materials. But this provision does not settle the questions of whether unclassified excavation performed by Stewart-Erickson outside the design prism is to be performed at the unit rate of eighty-four cents per cubic yard, under Item 1 of the prime contract, or only pursuant to written or oral change orders under General Provision 3 of the prime contract and, if the latter, whether, because of the interjection of change orders unclassified excavation outside the design prism is to be disregarded in computing Yardley's compensation under Item 1 of the subcontract. Nor do we find any other provision of the subcontract or prime contract which resolves these critical ambiguities.

2. Both parties recognize that the subcontract and prime contract must be read together.

We therefore conclude that the trial court did not err in determining that the subcontract is ambiguous in the respects described. It follows that the asserted rule, relied upon by Yardley, that parol evidence is inadmissible where the contract may be construed without resort thereto, is inapplicable.[3]

■ Yardley also directs our attention to the general rule that the doubt created by an ambiguity will be resolved against the one who prepared the contract. *See* Felton v. Menan Starch Company, 66 Wash.2d 792, 797, 405 P.2d 585, 588 (1965). However, this rule applies only where, after examining the entire contract, the relation of the parties, their intention, and the circumstances under which they executed the contract, the ambiguity remains unresolved. *See* Saturn Oil and Gas Co. v. Northern Natural Gas Co., 359 F.2d 297, 302 (8th Cir. 1966); Boswell v. Chapel, 298 F.2d 502, 506 (10th Cir. 1961) *and cases cited therein.* As developed below, consideration of the extrinsic evidence in this case leaves us with no doubt as to the intended meaning of the subcontract.

■■ Yardley contends that, even if parol evidence was properly admitted, the trial court erred in finding and concluding that, under Item 1 of the subcontract, Yardley's compensation is to be measured only by the amount of unclassified excavation within the design prism. We disagree.[4]

After reviewing all of the evidence, the trial court relied upon the following considerations in concluding that the parties to the subcontract intended that the twenty-seven and one-half cents per cubic yard Yardley was to receive for required rock work was limited to the excavation yardage within the design prism: (1) the history of dealings between Yardley and Stewart-Erickson or one of its members; and (2) Yardley's waiver of participation in the payments for additional excavation performed by Stewart-Erickson in removing unsuitable materials and constructing additional ditches.

With regard to the past dealings between the parties eight past transactions were considered. In four of these, as in the case now before us, there were overruns. In connection with two of these overrun instances, Yardley's compensation was paid on the basis of a lesser quantity (although still in excess of Yardley's original estimate) than that used as the basis for computation of the owner's payments to the prime contractor. This was because Yardley had not been required to perform any additional work in connection with the excluded portion of the overrun. In the other two instances, Yardley was paid on the same yardage utilized in computing payments to the prime contractor.

We are not satisfied that this past history is helpful in resolving the ambiguity in the contract now before us. In two of the four overrun instances, Yardley received compensation on the basis of the same yardage utilized in computing the prime's compensation. However, we cannot determine from this record, and the trial court did not find whether, in these latter instances, Yardley participated in the overrun only because it did rock work in connection therewith. In consequence, we cannot be certain that the method of computing Yardley's compensation provided for in those cases, is probative here.

---

3. Thus we need not consider the significance of the circumstances that not only did Yardley fail to object to parol evidence produced by Stewart-Erickson bearing upon the meaning of the subcontract, but that Yardley introduced extensive parol evidence of its own.

4. The parties do not dispute the proposition that, if the trial court correctly admitted extrinsic evidence, it was bound to make its decision after considering all the relevant circumstances surrounding the transaction, with a view to discovering the intention of the parties. *See* Hendry Corporation v. American Dredging Company, 318 F.2d 299, 302–305 (5th Cir. 1963); Wise v. Farden, 53 Wash.2d 162, 332 P.2d 454, 457 (1958).

In our view, the fact that Yardley waived participation in the payments for additional excavation performed by Stewart-Erickson in removing unsuitable materials and constructing additional ditches, lends demonstrable support to the trial court's construction of the subcontract. Both of these kinds of additional excavation represented work not contemplated by the design prism. Yet they involved unclassified excavation required by the Army Corps of Engineers. In these respects it would appear that Yardley, under its theory, was as much entitled to twenty-seven and one-half cents per cubic yard thereon, as it was with regard to the flattening of slopes beyond the design prism, here in question. Yardley's inconsistent position with regard to these three kinds of additional excavation tends to undermine its asserted construction of the subcontract pressed in this litigation.

But what we regard as a much more persuasive reason for accepting the trial court's ultimate conclusion of law is the fact that Yardley, with Stewart-Erickson's knowledge, first formulated a lump sum compensation figure, based upon its estimate of rock work within the design prism and then, for purposes of making progress payments possible, converted the lump sum figure into a cubic yard unit figure premised upon estimated unclassified excavation within the design prism—namely, 1,610,000 cubic yards.

The parties contemplated, of course, that there might be more, or less, work than estimated within the design prism (see Sam Macri & Sons, Inc. v. United States of America for Use of Oaks Construction Co., 313 F.2d 119, 124 (9th Cir. 1963)), and Yardley took its chances on this.[5] But there is nothing in the record to indicate that the parties thought realization of Yardley's lump sum figure might be augmented by relating its twenty-seven and one-half cent price to the additional excavation outside the design prism.[6] As observed above, Yardley did no rock work in connection with the additional excavation required in flattening the slopes.

It is true that, having in view the extrinsic evidence which was introduced, it is revealed that Stewart-Erickson performed the additional excavation involved in flattening the slopes under the eighty-four-cent unit bid set out in Item 1 of the prime contract, and not under change orders. But the point is that it required extrinsic evidence to resolve this uncertainty. The case having been thus permissibly opened up to consider extrinsic evidence, other extrinsic evidence establishes, as described above, that Yardley's Item 1 bid was confined to the amount of unclassified excavation required within the design prism.

The considerations referred to above lead us to conclude that the trial court did not err in rejecting Yardley's claim

---

5. As noted above, this recognized risk turned out to be to Yardley's advantage, both because there was a slight overrun within the design prism and because there was substantially less rock work to be performed within the design prism than the parties had originally anticipated.

6. This is not to say that, had rock work been encountered in connection with the additional flattening of slopes, Yardley would not have been required to perform it. But in that event it would have been entitled to additional compensation under Item 15 of the subcontract, and paragraph 3 of the General Provisions of the prime contract, referred to above. That the subcontract contemplated that Yardley might be required to perform rock work not anticipated in the original contract drawings and cross-sections attached to the prime contract, is indicated by Item 15 of the subcontract, which reads:

> "15. In the event, the Corps of Engineers orders any additional work and/or Force Account work in conjunction with the above items, Stewart-Erickson will take five per cent (5%) of the additional work and/or Force Account work allowed by the Corps of Engineers to cover cost of accounting, etc."

We also note that, in fact, Yardley performed certain work outside the design prism, for which it received extra compensation.

402

for additional compensation. Accordingly, we are not called upon to consider Yardley's final argument on appeal, relating to the allowance of attorneys' fees.

Affirmed.