LYON FURNITURE MERCANTILE AGENCY, Appellant,

v.

Irene M. CARRIER, doing business as Wishmaker House, Appellee.

No. 15778.

United States Court of Appeals Ninth Circuit.

Sept. 17, 1958.

Samuel A. Miller, Catlin & Catlin, Los Angeles, Cal., Meyer Lindenbaum, New York City, for appellant.

David G. Licht, Beverly Hills, Cal., for appellee.

Before BARNES and HAMLEY, Circuit Judges, and CLARK, District Judge.

HAMLEY, Circuit Judge.

Irene M. Carrier, doing business as Wishmaker House, at Phoenix, Arizona, brought this libel action to recover actual damages in the sum of $25,000, and punitive damages in the sum of $50,000. Defendant Lyon Furniture Mercantile Agency (Lyon) entered a general denial, and offered the affirmative defense that the communications in question were qualifiedly privileged. After a trial without a jury, judgment was entered for the plaintiff in the sum of $2,000, covering actual but not punitive damages. Defendant appeals.

Lyon is a partnership which engages in business in California and other states. The principal activity of the company is that of a credit reporting agency. It supplies this service to manufacturers, wholesalers, and jobbers in the home furnishing industry. Lyon has eight offices from coast to coast, and issues over one hundred thousand credit reports annually. These reports are issued only to subscribers under a contract, and then only in response to written request.

On December 29, 1953, Lyon released to certain wholesale furniture dealers a credit report concerning Wishmaker House. Revised credit reports covering the same business were similarly released on March 9 and 23, 1954, and April 18, 1955 [1].

In her amended complaint, Mrs. Carrier alleged that these reports were absolutely false in the following particulars:

> "That by innuendo the reports impute to plaintiff the securing of said business by coercion and duress; that the reports state that plaintiff had no previous retail furniture experience; that plaintiff employed a manager to operate said business; that 1954 payments were slow; that the bulk of plaintiff's purchases are being made on a C.O.D. basis."

It was alleged that Lyon made and delivered these reports wilfully and maliciously, then knowing the described statements to be false, and for the express and sole purpose of destroying Mrs. Carrier's credit and financial standing and of ruining her business. It was further alleged that, by reason of the making and publication of these statements, Mrs. Carrier's credit standing was damaged, with resulting adverse effect upon the business.[2]

---

[1]. In the amended complaint, reference is made only to the credit reports of March 23, 1954, and April 18, 1955. However, the amended complaint was further orally amended during the course of the trial to include the credit reports of December 29, 1953, and March 9, 1954.

[2]. It was specifically alleged:
"That by reason of the making and publication of this said false and libelous report by the defendant, the plaintiff has not been able to secure replacements for stock of goods on reasonable credit terms requisite to the continual successful operation of her said business from the aforementioned furniture manufacturers and dealers who formerly sold to her on credit, but have refused to sell on such credit since said false reports were made and published."
A second cause of action based on conspiracy between Lyon and persons unknown, but not asking for any additional damages, is also set out in the amended complaint. The record before us contains no further reference to this sec-

The trial court found that "many" of the five statements contained in the credit reports concerning which Mrs. Carrier complains were "false and untrue." The court did not expressly find that the statements were "wilfully and maliciously" made. Instead, the court found:

"That the defendant, acting by and through its duly authorized agents and servants, was grossly negligent in the preparation of the aforesaid reports in that then and there was in its possession information showing a substantially more favorable condition of plaintiff's business and of plaintiff's financial condition than was reported. The defendant was grossly negligent in the interpretation of the financial condition of the plaintiff as disclosed by the aforesaid statements and information then and there available to defendant."

The allegations concerning damage to the business (see footnote 2) were found to be true. Actual damages in the sum of $2,000 were found to have been sustaind. No punitive damages were allowed.

On this appeal, defendant contends in effect that: (1) One of the assertedly libelous statements was not made, by innuendo or otherwise; (2) the finding of fact that "many" of the statements in question were false is clearly erroneous; (3) special damage was not proved; (4) the statements were qualifiedly privileged; and (5) the motion to require plaintiff to file an undertaking to pay costs, as provided in West's Ann.Cal.Civ. Proc. § 830, should have been granted.

One of the libelous statements allegedly made was that Mrs. Carrier secure the business "by coercion and duress." It is not claimed that the credit reports issued by Lyon contain any express recital to that effect. It is her position, however, that other recitals contained in these reports by innuendo imply that Mrs. Carrier acquired the business in that manner. The recitals relied upon as giving rise to this innuendo, all having to do with Mrs. Carrier's marital difficulties, are quoted in the margin.[3]

The "taking over" or "acquisition," by a husband or wife, of the property or business of a marital community, due to "marital difficulties," does not reasonably imply the exertion of coercion and duress. It is common knowledge that in Arizona the division of community property as a result of marital difficulties is subject to court control. Consequently, when it is stated that one or the other member of the community "took over" or "acquired" property as a result of such difficulties, the natural assumption is that it was done pursuant to court decree, if not by agreement between the parties.

 The quoted words, therefore, cannot be said to imply that Mrs. Carrier acquired the business by coercion and duress, unless those words are to be given an unnatural and forced meaning. An unnatural and forced meaning, however, may not arise by innuendo. Lorentz v. R.K.O. Radio Pictures, 9 Cir., 155 F.2d 84, 87. Nor does the record reveal any extrinsic facts which would support such an implication.[4]

For the reasons indicated, we hold that no recital in the credit reports gave

---

ond cause of action. We therefore assume that it was abandoned or dismissed.

3. In the first three credit reports in issue, this statement is made: "On August 1, 1946, Frank N. Carrier, Jr. acquired this business from Joseph L. Peternel. He is reported to have continued the business until the Summer of 1953, when because of reported marital difficulties, the business was taken over by Iren [Irene] M. Carrier, his wife. * * * Present owner during the Summer of 1953, acquired this business from her husband who had

been the owner since August 1, 1946. * * * Present owner during the Summer of 1953 acquired this business from her husband, Frank N. Carrier, Jr." The fourth and final credit report here in issue contains the same statement, except that the final quoted sentence is omitted.

4. Mrs. Carrier testified, in effect, that she was forced to take charge of the business when Mr. Carrier went on an extended cruise in April, 1953. She later enjoined Mr. Carrier from coming into the store.

rise, by innuendo or otherwise, to the implication that Mrs. Carrier acquired the business by coercion and duress.

The next question to be dealt with is whether the finding of fact, that "many" of the statements in question were false, is clearly erroneous. Since this finding is inconclusive as to just which statements were false, we must examine the supporting evidence as to each. We may, however, disregard the alleged statement that plaintiff secured the business by coercion and duress, since it has been determined that no such statement was made.

■■ Examination of the record convinces us that the finding of fact as to the falsity of the statements in the credit reports to the effect that plaintiff had no previous retail furniture experience, is not clearly erroneous. We reach the same conclusion with regard to the statements that Mrs. Carrier employed a manager to operate the business.

One of the two remaining statements relied upon was to the effect that "1954 payments were slow." Statements of this kind were made in the March 9 and 23, 1954, credit reports, the exact words being: "Inquiry at this time finds payments generally slow."[5]

Substantially all of the evidence bearing upon the truth or falsity of this statement is to be found in the testimony of Mrs. Carrier. There is no other evidence in the record tending to support the finding that this statement was false.

According to Mrs. Carrier's testimony, the business had assets of $70,000 and liabilities of $49,000 when the protracted absence of Mr. Carrier forced her to take over the operation in April 1953. Most of the liabilities consisted of accounts payable for merchandise furnished during the previous three months by some sixty creditors. Between April and October 1953, these liabilities were reduced to about $21,000. This was principally accomplished by applying to the payment of these accounts the proceeds of special merchandise sales, and the proceeds of the sale of certain corporate investments.

During the summer of 1953, with the assistance of Wholesalers Credit Association of Arizona, Mr. and Mrs. Carrier entered into an agreement with the creditors. One provision of this agreement was that $1,000 a month would be applied on past indebtedness, beginning November 15, 1953.

Mrs. Carrier was unable to make the April 1954 payment of $1,000 on past due bills. She therefore asked her creditors for a three-month moratorium, which was granted. She made a $1,000 payment in June, 1954, but was able to pay only $500 in July. The size of the monthly payments made during the remainder of 1954 is not revealed in the record.[6]

Three creditors were not satisfied with this reduced payment, and their claims, aggregating $1,400, were turned over to Lyon for collection. Suits were instituted. Mrs. Carrier then paid two of these claims in full, leaving about $400 due on the third claim held by Lyon. This was settled for fifty cents on the dollar.

By January 1955, the business indebtedness had been reduced to $9,700. Through Wholesalers Credit Association, Mrs. Carrier then offered to settle this re-

---

Mrs. Carrier also testified that she became the owner of the business by virtue of a divorce decree, which became final in September of that year.

5. These two credit reports and the earlier one of December 29, 1953, also contain a credit rating of "13-6." According to a "credit key" with which each subscriber had been supplied, the number "13" means "inquire for report," and the number "6" means "very slow payments." The credit rating in the December 29, 1953, report, of course, could not be a representation as to payments in 1954.

The credit rating noted in the April 18, 1955, report was "13."

6. From these monthly payments on past due bills, made in 1953 and 1954, percentage distributions were made as follows: December 15, 1953—six per cent; February 18, 1954—six per cent; June 30, 1954—three per cent; October 28, 1954 —three per cent. These distributions, together with the distributions made prior thereto, amounted to sixty-nine per cent of the total amount of the overdue claims.

maining balance for $3,000. This offer was accepted, except for three creditors with claims aggregating $700. The latter creditors received payment in full. Those who accepted the settlement offer received a total of seventy-nine per cent of their respective claims. During all of this period, Mrs. Carrier made her current purchases for cash.

One cannot read this record without gaining admiration for the way in which Mrs. Carrier saved a business which was about to go under. The perseverance, fairness to creditors, and good business judgment which she manifested during these trying days is highly commendable, and proved most effective.

Yet we cannot ignore what the tenor of her testimony frankly admits—that payments to creditors in 1954 were slow. They were unavoidably slow, but slow nevertheless. During one three-month period in 1954, no payments were made on creditor's claims which were then more than a year old. In July 1954, only $500 was paid on past due claims which must then have aggregated more than $10,000. The percentage distributions to creditors in 1954 aggregated only twelve per cent of the original amount due. At the end of that year, thirty-one per cent of the amount due creditors prior to April 1953 was still unpaid.

It is true that current purchases were being made for cash. This, however, is not what was referred to in the credit reports. It is recited in these reports that most purchases were then being made C.O.D. The reference to slow payments must therefore have referred to the past due claims which had accumulat-

ed prior to April 1953. In his opening statement, counsel for Mrs. Carrier told the court: "She was in fact a slow pay during this period, there is no question about that. * * *"

■ We therefore conclude that the finding of fact, that the statement "1954 payments were slow" was false, is clearly erroneous.

The finding of falsity as to the statement that "the bulk of plaintiff's purchases are being made on a C.O.D. basis," remains to be considered.[7] Again, we refer only to Mrs. Carrier's testimony, there being no other evidence favorable to the finding.

Mrs. Carrier testified that as soon as she began operating the business in April 1953, she learned that there were sixty creditors with overdue claims aggregating $43,533.82. She discussed the matter with the two largest creditors. With regard to one of these, Mrs. Carrier testified: "* * * We worked it out, at my own suggestion, that I would go on a C.O.D. basis. * * *" Concerning her discussion with the other large creditors, Mrs. Carrier testified: "* * * We worked out the same type of arrangement, I automatically went on C.O.D. * * *"[8] On January 29, 1955, Mrs. Carrier sent a mimeographed letter to all creditors, in which they were advised that she was on a C.O.D. basis.

Mrs. Carrier testified, however, that, notwithstanding this statement in the letter of advice, the basis actually being used was C.B.D. At another point in her testimony, Mrs. Carrier explained that she voluntarily adopted the C.B.D. basis, instead of C.O.D., as it afforded her

---

7. In the December 29, 1953, credit report, it was stated that the "* * * majority of suppliers show a preference for C.O.D. transactions." A similar statement was made in the March 9 and 23, 1954, reports. The April 18, 1955, report states: "The bulk of her purchases are now being made on a C.O.D. basis."

8. A letter sent to creditors on June 26, 1953, by Wholesalers Credit Association, on behalf of Mrs. Carrier, states: "As a matter of information, none of the creditors within the State of Arizona have

received any funds from Carrier's Furniture Company with the exception of C.O.D. sales. * * * It would seem advisable to withhold from distribution $1,500.00 or $2,000.00 in cash for C.O.D.'s, salaries, etc., in order to permit Mrs. Carrier to continue the operation of the store." Letters from three furniture suppliers, placed in evidence by Mrs. Carrier, indicate that those companies declined to ship goods on open account, but were willing to do so C.O.D. or C.B.D.—cash before delivery.

creditors more protection. The result was, however, that she would sometimes pay cash for goods several months in advance of receiving them.[9]

We think it must be clear from Mrs. Carrier's testimony that the statements made in the credit reports to the effect that "a majority of suppliers show a preference for C.O.D. transactions," and that "the bulk of her purchases are now being made on a C.O.D. basis," were substantially correct. At the beginning of the period, Mrs. Carrier agreed with her principal creditors that she would go on a C.O.D. basis. Near the end of the period, she advised all of her creditors that she was on that basis.

The basis actually used—C.B.D.—is not substantially different from C.O.D., in so far as any connotation prejudicial to her credit is concerned. If general knowledge that a business is on a C.O.D. basis is hurtful, it is because of the implication that suppliers will not do business on credit. The same implication, perhaps magnified, is to be drawn from knowledge that business is being conducted on a C.B.D. basis. The latter could well give rise to the inference that suppliers will not even ship C.O.D., but demand cash in advance. This was not the fact here, since Mrs. Carrier voluntarily adopted the C.B.D. practice. The plain intendment of her testimony, however, is that if she had not done so, the alternative would have been C.O.D.

 It is therefore our conclusion that the finding of fact, to the effect that

the statements concerning C.O.D. transactions were false, is clearly erroneous.

It follows from what is said above, that the only assertedly libelous statements which were properly found to be false are the statements that "plaintiff had no previous retail furniture experience," and that "plaintiff employed a manager to operate said business."

Appellee does not contend that either of these statements is a libel on its face. In effect, however, it is her position that, considered in connection with all of the circumstances of the case, the statements are defamatory.[10] We will assume this to be true.

 Since, however, neither of the statements is a libel on its face, they are not actionable unless it was alleged and proved that Mrs. Carrier suffered special damage as a proximate result thereof. This is an express requirement of West's Ann.Cal.Civ.Code, § 45a, quoted in footnote 10.

The trial court found that special damages in the amount of $2,000 were sustained. Appellant argues, in effect, that this finding is clearly erroneous, and that no special damages were proved.

"Special damages," as defined in West's Ann.Cal.Civ.Code, § 48a 4(b), are

"* * * all damages which plaintiff alleges and proves that he has suffered in respect to his property, business, trade, profession or occupation, including such amounts of money as the plaintiff alleges and

---

9. Mrs. Carrier also testified:

"Q. And it is correct, Mrs. Carrier, and you correct me if I am in error, that we have definitely established that prior to the first of 1954, you were on either a C.O.D. or a C.B.D. basis? A. Say that again, please, Mr. Catlin. Q. Prior to January 1, 1954. A. From 1953, April, 1953. Q. Through this period? A. Through that period, yes. I automatically put myself on a C.O.D. basis in Phoenix. Q. But you were on either a C.O.D. or a C.B.D. basis? A. That is right. You may continue that for a long time."

10. West's Ann.Cal.Civ.Code, § 45a, provides:

"A libel which is defamatory of the plaintiff without the necessity of explanatory matter, such as an inducement, innuendo or other extrinsic fact, is said to be a libel on its face. Defamatory language not libelous on its face is not actionable unless the plaintiff alleges and proves that he has suffered special damage as a proximate result thereof. Special damage is defined in Section 48a of this code."

proves he has expended as a result of the alleged libel, and no other."

The special damage claimed by Mrs. Carrier was her asserted inability to obtain goods on open account, with resultant loss of gross and net income. There is substantial evidence in the record to indicate that she could not obtain goods on open account during this period. There is not a scintilla of evidence, however, that the reason for this was the publication of the statement that she had no previous retail furniture experience, or of the statement that she employed a manager to operate the business. Nor is there any substantial evidence that inability to obtain goods on open account resulted in loss of net income of any ascertainable amount.

The principal reason why Mrs. Carrier could not obtain goods on open account was that a fair appraisal of the financial condition of the business during the period in question did not warrant an extension of credit. The reasons for this are set out at length above, and need not be repeated here. Mrs. Carrier herself acknowledged that she was not entitled to a good credit rating, considering the amount of creditor's claims. It was apparently her view, during the period in question, that even a C.O.D. arrangement would not afford her creditors sufficient protection. This was her explanation for voluntarily putting herself on a C.B.D. basis.[11]

It may well be that the reports as to the financial condition of the business, as contained in the Lyon publications, adversely affected the credit of the business. That is almost always the effect of an unfavorable report. Mrs. Carrier's attorney made it clear, during his closing argument, that the real harm done by the Lyon reports was the statement therein that her statement "shows liquid and current ratio sub-standard." But this statement was patently true. In any event, it is not one of the statements which appellee claims were libelous, nor one of the assertedly libelous statements which were properly found to be false.

As indicated above, there is also no substantial evidence that inability to obtain goods on open account resulted in loss of net income of any ascertainable amount. Mrs. Carrier testified that in 1948 or 1949, the annual business net was $19,000, and that it continued to build up after that. At this time, purchases were always made on open account. She expressed the view that, considering "the traffic that we have had and the way the store is liked and my personal reputation in the city," the business should be (presumably at the time of the trial in May 1957) netting $12,000 to $15,000 a year. She testified that actually "we have been running in the red."

Mrs. Carrier's estimate of the net in "either '48 or '49" was based on what "my husband said." No financial statements, books of account, or other documentary evidence was offered in support of the 1948 or 1949 figures, or the current figures. What the business was "running" on or about the time of the trial was of course irrelevant.

Moreover, there is no evidence whatever to establish what, if any, reduction in net income was attributable to Mrs.

11. There were also other reasons contributing to Mrs. Carrier's difficulties, which undoubtedly affected her ability to obtain credit. Referring to the reaction of the business creditors as a result of Mr. Carrier's leaving the business, Mrs. Carrier testified: "And the news got around very quickly that Frank Carrier had gone on a cruise. So they just simply all started folding in." Business was also very poor at this time, Mrs. Carrier testified. "We sweat the summer out. It was horrible," she said. This was long before the issuance of the first credit report involved in this action.

The lease on the store building expired in December 1953, and Mrs. Carrier was unable to obtain a renewal. In January 1954, she acquired a five-room house, which was remodeled to serve as a store. She then changed the name of the business to "Wishmaker House." As there was more inventory than could be moved into this building, Mrs. Carrier rented another store where the excess inventory was liquidated over a period of months.

Carrier's inability to obtain goods on open account. There was some testimony that Mrs. Carrier was unable to accept some business because of her lack of credit. However, no effort was made to translate this into even an estimate of loss in dollars. Mrs. Carrier's return to the witness stand late in the trial to testify that she had put additional capital into the business, in the amount of $20,-100, was of no help in proving special damages.

It is accordingly our opinion that, as to the only two allegedly libelous statements which were properly found to be false, neither of which was libelous on its face, no special damages were proved. The finding of fact that Mrs. Carrier had been damaged in the sum of $2,000 is therefore clearly erroneous.

Since the conclusions expressed above require reversal, it is unnecessary to consider appellant's further contentions that the statements in question were qualifiedly privileged, and that the motion to require appellee to file an undertaking to pay costs should have been granted.

The judgment is reversed.