719 F.2d 992
 37 UCC Rep.Serv. 1134, 37 UCC Rep.Serv. 779
 INTERPETROL BERMUDA LIMITED, a Bermuda corporation,
Plaintiff-Appellant,
v.
KAISER ALUMINUM INTERNATIONAL CORPORATION, a corporation;
Occidental Crude Sales, Inc., a corporation; Occidental
Petroleum Company, a corporation; Robert E. Traweek and
Geraldine Traweek, Defendants-Appellees.
Fred M. Traweek, Third-Party Defendant-Appellee.
 No. 82-4327.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted May 9, 1983.
Decided Nov. 1, 1983.
As Amended Jan. 27, 1984.
 
 Thomas P. Devitt, Thelen, Marrin, Johnson & Bridges, John Anderson, Landels, Ripley & Diamond, San Francisco, Cal., for appellees.
 Kurt W. Melchior, Severson, Werson, Berke & Melchior, San Francisco, Cal., for plaintiff-appellant.
 Appeal from the United States District Court for the Northern District of California.
 Before ANDERSON, SKOPIL and NORRIS, Circuit Judges.
 SKOPIL, Circuit Judge:
 
 INTRODUCTION
 
 1
 InterPetrol Bermuda Limited ("InterPetrol") appealed from the district court's dismissal of its fraud and contract related claims against Kaiser Aluminum International Corporation ("Kaiser"). We affirm the district court.
 
 FACTS
 
 2
 Trako Energy Corporation ("Trako"), a petroleum broker controlled by the Traweek family, entered into a contract with the Chinese Petroleum Corporation ("CPC") to have crude oil refined at CPC's refinery in Taiwan.
 
 
 3
 On April 11, 1979 Trako and Occidental Crude Sales, Inc. ("Oxy Crude"), a large supplier of crude oil, entered into a contract for the sale to Trako of heavy Arabian crude oil for shipment from the Persian Gulf to Taiwan.
 
 
 4
 In early May 1979 Trako contracted to sell specified quantities of refined oil products to Kaiser, with delivery to be taken in Taiwan in the latter half of June. Trako informed Kaiser that the source of supply would be Oxy Crude.
 
 
 5
 Immediately after arranging the purchase from Trako, Kaiser contracted with InterPetrol, an international spot trader in petroleum, to sell to InterPetrol the refined oil products that Kaiser was to obtain from Trako. InterPetrol was to take delivery at the CPC terminal in Taiwan, but was unaware of the source of the crude CPC would be refining. The contract was made orally and confirmed in Telexes.
 
 
 6
 The last term to be agreed on was a force majeure clause excusing performance by Kaiser. The force majeure clause was negotiated orally with parts of the negotiations, including a final confirmation of agreement, revealed by Telexes. The primary dispute in this case is the meaning and effect to be given this force majeure clause.
 
 
 7
 The volatile market for petroleum experienced a dramatic rise in price during April of 1979. To take advantage of this market, Oxy Crude sought a release from Trako from the contract to supply crude for the Trako/Kaiser/InterPetrol deal. On May 9, 1979 Trako and Oxy Crude executed a release from their sales contract. Oxy Crude then resold the crude oil originally intended for refining and delivery to Kaiser. Pursuant to the terms of the release agreement between Oxy Crude and Trako, Oxy Crude paid Trako one half of the profits on the resale of the oil. The two split approximately 6.5 million dollars. Subsequently, Kaiser invoked the force majeure clause in its contract with InterPetrol to excuse its own failure to perform by reason of the loss of its supply of oil.
 
 PROCEEDINGS BELOW
 
 8
 In March 1980 InterPetrol brought a diversity action against Kaiser for breach of contract and related fraud claims. InterPetrol joined as defendants Occidental Petroleum Company and its subsidiary, Oxy Crude, and the Traweek family members individually. InterPetrol's suit against the later joined defendants was in tort for interference with contractual relations and under the Uniform Commercial Code ("U.C.C.")[1] on the theory that Kaiser's contract rights against Oxy Crude and the Traweeks should be assigned to InterPetrol if Kaiser were excused under the force majeure clause. Kaiser filed a third-party complaint against Trako, Oxy Crude and the Traweeks for breach of contract and related claims. Oxy Crude filed counterclaims and cross-claims against Kaiser and InterPetrol, demanding indemnification from the injuries it might be found to have caused the other.
 
 
 9
 InterPetrol's tort claims against Occidental Petroleum, Oxy Crude and the Traweeks were dismissed by the trial court.[2] The court then ordered the trial conducted in two parts, with the first part limited to InterPetrol's contract and fraud claims against Kaiser. After InterPetrol had presented its case in a bench trial, Kaiser's motion to dismiss under Fed.R.Civ.P. 41(b) was granted. The court held that the force majeure clause excused Kaiser, that InterPetrol did not thereby inherit Kaiser's claims against its suppliers, and that there was no substance to the claim that InterPetrol's contract with Kaiser was fraudulently induced. Kaiser, Oxy Crude and the Traweeks chose not to pursue their counterclaims and cross-claims and the third-party action was dismissed without prejudice. InterPetrol appealed.
 
 ISSUES
 
 10
 1. Was Oxy Crude a supplier of Kaiser?
 
 
 11
 2. Did the district court err in denying InterPetrol's claim that its contract with Kaiser was fraudulently induced?
 
 
 12
 3. Was the force majeure clause intended to excuse Kaiser if its suppliers defaulted for economic reasons?
 
 
 13
 4. Was Kaiser required to transfer its rights against its suppliers to InterPetrol?
 
 DISCUSSION
 
 14
 1. Kaiser's Suppliers.
 
 
 15
 InterPetrol claims that Oxy Crude as well as Trako was a supplier to Kaiser because Oxy Crude and Trako were joint venturers as to the crude oil cargo.
 
 
 16
 Minute Maid Corp. v. United Foods, Inc., 291 F.2d 577 (5th Cir.1961), cited by appellant, is most persuasive.[3] In Minute Maid, a cold storage business furnished financing and warehouse facilities to make possible expanded use of United Foods' status as a direct buyer of Minute Maid products. The agreement between the two businesses provided for joint control over the mutual enterprise, with profits to be shared.
 
 
 17
 Little distinguishes Minute Maid from the present case. Oxy Crude was more than just the source of crude oil for Trako. Oxy Crude provided the credit for Trako's refining contract with CPC. Profits generated were to be divided equally between Oxy Crude and Trako. More important, Oxy Crude and Trako agreed to share potential losses. The indicia of partnership discussed in Minute Maid are present. We are persuaded that Oxy Crude and Trako's relationship was a joint venture with respect to the crude oil cargo. Oxy Crude was thus as much a supplier of Kaiser as was Trako, with whom Kaiser dealt directly.
 
 
 18
 2. Fraud Claims.
 
 
 19
 We review a district court's findings on fraud claims under the clearly erroneous standard of review. Lenske v. Knutsen, 410 F.2d 583, 585 (9th Cir.1969); Lyon Furniture Mercantile Agency v. Carrier, 259 F.2d 106, 109 (9th Cir.1958).
 
 
 20
 InterPetrol contends that Kaiser made four specific misrepresentations: (a) that Kaiser had its own refining contract with the CPC; (b) that Kaiser's supplier was one of the world's largest independent petroleum companies; (c) that InterPetrol need not worry about failure of supply because Kaiser's supplier had a reputation for dependability; (d) that the force majeure clause initially proposed by Kaiser was the clause it routinely used. The district court held that Kaiser's representations were not material and therefore dismissed InterPetrol's claims.
 
 
 21
 (a) The testimony shows that Kaiser indicated that it had "some products out of processing," suggesting that the refining contract was Kaiser's own. However, Henri Lehner, the chief negotiator and sole owner of InterPetrol, testified that this point was not crucial to the transaction. Therefore, the district court cannot be said to have clearly erred upon finding immateriality on this claim.
 
 
 22
 (b) InterPetrol also claims that Kaiser misrepresented that its supplier was one of the world's largest, giving an implied assurance of performance.
 
 
 23
 InterPetrol's claim might have substance if Trako was Kaiser's only supplier. The evidence shows that Trako had no capacity to finance crude oil transactions and indeed never engaged in any transactions other than the one in suit. But Kaiser was to be supplied by a joint venture of Trako and Oxy Crude. It is undisputed that Oxy Crude is one of the world's largest suppliers of crude oil. Kaiser's representation that it was supplied by one of the world's largest suppliers was truthful and forms no basis for a fraud claim.
 
 
 24
 (c) InterPetrol contends that Kaiser represented that its supplier had a reputation such as to assure delivery. The trial court held that even if it is assumed that Trako (and not Oxy Crude) was the supplier referred to, "whether one could consider [Trako] a flake as that term is used in the oil industry is a matter of judgment as to which, based on the evidence, reasonable minds could differ." It was the view of the district court that Kaiser's representation was an expression of opinion rather than an assertion of fact.
 
 
 25
 The district court assumed for purposes of argument that the supplier referred to was Trako. In fact, Kaiser was to be supplied by the joint venture of Trako and a company with an established reputation in the oil business, Oxy Crude. Yet we need not consider what effect accuracy has on an analysis of a fraud claim involving an opinion as to reputation. Statements of opinion are not generally actionable in fraud. See, e.g., Hauter v. Zogarts, 14 Cal.3d 104, 120 Cal.Rptr. 681, 685, 534 P.2d 377, 381 (1975) (and cases cited therein). Given the nebulous nature of references to reputation, it cannot be said that the district court clearly erred.
 
 
 26
 (d) InterPetrol contends that Kaiser assured it that the force majeure clause initially proposed by Kaiser was the clause Kaiser routinely used and was non-negotiable. The clause first requested by Kaiser would have excused Kaiser if its supplier failed to deliver for any reason, with Kaiser's protection extending to time of delivery of refined products at CPC's terminal.
 
 
 27
 The evidence showed that the clause initially proposed by Kaiser was the clause it normally used, but Kaiser occasionally modified or omitted the clause from an agreement. InterPetrol was a party to one of those prior agreements and therefore had notice that Kaiser sometimes varied its force majeure clause. It is difficult to see what reliance InterPetrol might have placed on Kaiser's assertions, since InterPetrol insisted that Kaiser modify the clause under review in this case. To the extent there was reliance, it was unreasonable in view of the notice to InterPetrol that Kaiser's normal clause was negotiable. The district court's ruling on this representation cannot be deemed clearly erroneous.
 
 3. Force Majeure
 
 28
 On May 8, 1979, after two days of telephone negotiations, Kaiser and InterPetrol agreed to a force majeure clause, which InterPetrol confirmed via Telex. The Telex states:
 
 
 29
 The force majeure due to failure or delay of seller's suppliers of product and transportation shall terminate, upon notification by sellers that the vessel delivering crude to Taiwan has left loading port in the Persian Gulf which is advised to take place latter part of May. Otherwise only standard force majeure to apply.
 
 
 30
 Kaiser claims, and the district court held, that the force majeure clause excused Kaiser from the contract if its supplier failed to deliver for any reason, including diversion of the cargo for a higher price, until the time the crude was shipped from the mideast. InterPetrol asserts that it never agreed to any "economic" force majeure.
 
 
 31
 A summary of the negotiations is only slightly helpful in interpreting the clause. On May 7, 1979, after preliminary discussions, Kaiser sent InterPetrol a Telex accepting InterPetrol's offer to purchase various refined petroleum products. Kaiser's acceptance was conditioned upon agreement to its normal force majeure clause, "covering acts beyond the control of either party, including failure or delay of seller's supplier of product and transportation." All parties agree that, pursuant to Kaiser's initial proposal, Kaiser would have been excused from performing if the crude oil supply failed for any reason whatsoever, including diversion by Kaiser's supplier to another buyer for a higher price. Both parties agree that InterPetrol originally protested the breadth of Kaiser's economic force majeure proposal. Both parties also agree that a compromise was reached. It is the nature of the compromise which is in dispute.
 
 
 32
 InterPetrol's view of the compromise is as follows: Standard industry force majeure clauses excuse performance if an unforeseeable, involuntary event such as fire or shipwreck befalls the seller or its immediate supplier. According to InterPetrol, Kaiser's immediate supplier was CPC, which means standard (non-economic) force majeure would have covered Kaiser and CPC. InterPetrol asserts that Kaiser merely wanted to extend standard, non-economic force majeure beyond CPC to others in the chain of supply. InterPetrol argues it agreed to extend non-economic force majeure to Kaiser's supplier of crude, but only until the crude oil was loaded aboard ship in the Persian Gulf.
 
 
 33
 Kaiser's version of the compromise is much different. Kaiser acknowledges that InterPetrol initially objected to its proposed economic force majeure clause. When Kaiser stood firm, however, InterPetrol proposed a compromise where economic force majeure would apply provided it terminated once the crude was loaded in the Persian Gulf. According to Kaiser, standard or non-economic force majeure was to apply from that time forward.
 
 
 34
 The interpretation of a contract is a mixed question of fact and law. United States, Etc. v. Haas & Haynie Corp., 577 F.2d 568, 572 (9th Cir.1978). The principles of contract interpretation to be applied are legal issues which this court reviews de novo. Id. The factual findings by the district court as to what the parties said and did, however, must be accepted unless clearly erroneous. Id. It is the latter with which we are concerned here.
 
 
 35
 We are faced with an oral contract, the relevant portion of which was confirmed by InterPetrol by Telex. The critical difference between the parties during negotiations prior to the confirming Telex was Kaiser's insistence on an economic force majeure clause. We are unable to say that the district court was clearly erroneous in giving the force majeure clause the meaning advocated by Kaiser. The court carefully considered all the testimony and documentary evidence and chose between two plausible interpretations. We are not free to disregard the district court's decision.
 
 
 36
 The district court found it difficult to believe that, after expressing deep concern over economic force majeure, InterPetrol would not have expressly indicated in the Telex that economic force majeure was not a part of the agreement. Faced with conflicting testimony, the district court relied on the Telex, which did not expressly deny economic force majeure and, in fact, utilized the identical phraseology previously used to describe economic force majeure.[4] Moreover, the final sentence of the Telex would have been rendered superfluous under InterPetrol's interpretation.[5]
 
 
 37
 InterPetrol's interpretation of the compromise force majeure clause is reasonable only if it is accepted that standard (non-economic) force majeure in the industry would have covered Kaiser and CPC. Standard industry force majeure would have covered Kaiser and its immediate supplier. CPC was not a supplier of Kaiser. CPC performed refining services for the Trako/Oxy Crude joint venture. Kaiser's immediate supplier was the Trako/Oxy Crude joint venture, to which standard industry force majeure would have extended without the clause as interpreted by InterPetrol. Under InterPetrol's interpretation of the clause, there would have been no compromise at all from InterPetrol's standpoint, and a complete concession of demands for additional protection on the part of Kaiser. We doubt that Kaiser would have entirely given up its demands without some express indication.
 
 
 38
 The district court's conclusion, and ours, is supported by the general rule that questions of contract interpretation will be resolved against the party who prepared the writing. See Haas & Haynie Corp., 577 F.2d at 574. Where, after examining all the evidence, including the course of relations between parties and the circumstances under which they executed the contract, a question of contract interpretation remains, a court is entitled to resolve the question against the party who prepared a writing. United States ex rel. Yardley Drilling Co. v. Erickson Paving Co., 465 F.2d 396, 400 (9th Cir.1972). Though this was an oral contract, the force majeure clause was memorialized in a written Telex. The district court did not err in concluding that the force majeure clause agreed on by the parties was intended to excuse Kaiser if its supplier failed to deliver for any reason until the time the crude reached the ship in the Persian Gulf, with non-economic force majeure to govern from that point forward.
 
 
 39
 4. Was Kaiser required to transfer its rights against suppliers to InterPetrol.
 
 
 40
 InterPetrol claims that Kaiser was required to turn over its rights against its suppliers to InterPetrol.
 
 
 41
 InterPetrol relies primarily on comment 5 to section 2-615[6] of the U.C.C., which provides in part that
 
 
 42
 [i]n the case of failure of production by an agreed source for causes beyond the seller's control, the seller should, if possible, be excused since production by an agreed source is without more, a basic assumption of the contract. Such excuse should not result in relieving the defaulting supplier from liability nor in dropping into the seller's lap an unearned bonus of damages over. The flexible adjustment machinery of this article provides the solution under the provision on the obligation of good faith. A condition of making good the claim of excuse is the turning over to the buyer of his rights against the defaulting source of supply to the extent of the buyer's contract in relation to which excuse is being claimed.
 
 
 43
 (Emphasis added.)
 
 
 44
 The district court held that the comment was not intended to override the terms of the contract, looking specifically to the force majeure clause.
 
 
 45
 We agree with the district court that comment 5 does not control in this case. Kaiser was not excused under section 2-615 and could not have been. Section 2-615 applies only when the events that made the performance of the contract impracticable were unforeseen at the time the contract was executed. See Taylor-Edwards Warehouse Co. v. Burlington Northern, Inc., 175 F.2d 1330, 1336 (9th Cir.1983). The extensive negotiations over the force majeure clause, discussed above, indicate that the parties not only foresaw the risk that Oxy Crude would default but also bargained over which party would bear the loss in that event. Accordingly, it would violate fundamental principles of contract law to use section 2-615 of the U.C.C. to rewrite the contract to which the parties agreed. U.C.C. Sec. 2-615, comment 8 (section 2-615 inapplicable if "contingency in question is ... included among the business risks which are fairly to be regarded as part of the dickered terms ....").
 
 
 46
 Although there has been some doubt expressed as to whether the Code permits parties to bargain for exemptions broader than those available under section 2-615,[7] at least one circuit has concluded they may. See Eastern Airlines, Inc. v. McDonnell Douglas Corp., 532 F.2d 957, 990 (5th Cir.1976). See also Olson v. Spitzer, 257 N.W.2d 459 (S.D.1977) (exculpatory clause valid for defining events which excuse seller's performance). We agree with the Fifth Circuit. Comment 8 to section 2-615 plainly indicates that parties may "enlarge upon or supplant" section 2-615.[8] While exculpatory clauses phrased in general language should not be construed to expand excuses not provided for by the Code, circumstances surrounding a particular agreement may indicate that the parties intended to accord the seller an exemption broader than is available under the U.C.C.[9] Eastern Airlines, 532 F.2d at 990-91. We have already decided that the force majeure clause agreed to by Kaiser and InterPetrol was intended to excuse Kaiser prior to shipment of the crude from the Persian Gulf if Kaiser's supplier failed to deliver for any reason. We now hold that it was permissible for them to make such an agreement. Thus, if InterPetrol is to prevail on its claim that it succeeds to Kaiser's rights, it must do so on grounds apart from the Code.
 
 
 47
 California courts have read into force majeure clauses an implied covenant of good faith. Terry v. Atlantic Richfield Co.,, 72 Cal.App.3d 962, 964, 140 Cal.Rptr. 510, 511 (1977); see Milton v. Hudson Sales Corp., 152 Cal.App.2d 418, 427, 431, 313 P.2d 936, 942 (1957). This common law covenant of good faith is applicable to force majeure clauses such as the one agreed to by Kaiser and InterPetrol. If the common law requirement of good faith implies a requirement that a seller turn over to its buyer the seller's rights against a defaulting supplier, then the district court erred in granting Kaiser's motion to dismiss.
 
 
 48
 InterPetrol failed to cite any instance under the common law, under circumstances similar to those of this case, where a buyer succeeded to the rights of the seller against a defaulting supplier.[10] The common law has not provided to a disappointed buyer the rights called for by InterPetrol.
 
 
 49
 We see no reason to now create a right which has not been recognized by the common law. There is a certain amount of economic wisdom in permitting a seller, consistent with the limiting provisions of the Code,[11] to contract out of liability. In a relatively free and fluid wholesale market, a seller should be entitled to utilize the power of his position to contract to his best advantage. That might include, as here, the extraction of a force majeure clause from a buyer. If the seller's supplier is not able because of market forces to require a similar provision in the agreement between seller and supplier, the result is that the seller is excused but the supplier is not. Yet we see no reason to award the windfall of recovery against the supplier to the buyer, who agreed to excuse the seller, instead of the seller, who was able to insist on better protections. When a trader is able to bargain for such favorable conditions, the natural trend will be for traders in the less favorable positions of buyer and supplier to move into the less competitive and therefore more contractually secure part of the market.
 
 
 50
 We find no reason to transfer the benefit of Kaiser's superior negotiating position to InterPetrol by giving InterPetrol Kaiser's rights against Trako and Oxy Crude. We do find that it serves the forces of natural market adjustments not to transfer Kaiser's rights. We therefore affirm the decision of the district court.[12]
 
 CONCLUSION
 
 51
 The district court did not err in concluding that InterPetrol's contract with Kaiser was not fraudulently induced. The force majeure clause excused Kaiser when its supplier defaulted for economic reasons. Kaiser was not required by either the U.C.C. or the common law to turn over its rights against its suppliers to InterPetrol. Because we affirm the district court with regard to both theories of liability, we need not consider the issue of damages.
 
 
 52
 The district court is AFFIRMED.
 
 
 
 [1]
 California has adopted the U.C.C., including all provisions relevant to this case. For convenience we will refer to relevant provisions as they are designated under the U.C.C. rather than as designated under the California Code
 
 
 [2]
 InterPetrol does not appeal those dismissals
 
 
 [3]
 The relationship between Oxy Crude and Trako is defined by Texas law because their contractual relationship was formed in Texas. To this the parties agree. Minute Maid involves the application of Texas law
 
 
 [4]
 Kaiser initially proposed a clause which would have excused Kaiser if its supplier failed to deliver for any reason, including diversion to another buyer at a higher price. Kaiser described it as force majeure "due to failure or delay of seller's suppliers of product and transportation." The quoted language is duplicated in InterPetrol's confirming Telex
 
 
 [5]
 Under InterPetrol's interpretation, there is no need to differentiate between types of force majeure since standard force majeure was to prevail throughout the contract period. The final sentence of the Telex is apparently to differentiate between types of force majeure to apply during different periods, depending on where the crude oil was in its journey. InterPetrol's interpretation therefore renders the last sentence of the clause superfluous
 
 
 [6]
 Section 2-615(a) of the U.C.C. provides that: [d]elay in delivery or non-delivery in whole or in part by a seller ... is not a breach of his duty under a contract for sale if performance as agreed has been made impracticable by the occurrence of a contingency the non-occurrence of which was a basic assumption on which the contract was made
 
 
 [7]
 See Hawkland, The Energy Crisis and Section 2-615 of the Uniform Commercial Code, 79 Com.L.J. 75 (1974)
 
 
 [8]
 Comment 8 to section 2-615 provides that:
 The provisions of this section are made subject to assumption of greater liability by agreement and such agreement is to be found not only in the expressed terms of the contract but in the circumstances surrounding the contracting, in trade usage and the like. Thus the exemptions of this section do not apply when the contingency in question is sufficiently foreshadowed at the time of contracting to be included among the business risks which are fairly to be regarded as part of the dickered terms, either consciously or as a matter of reasonable, commercial interpretation from the circumstances.... The exemption otherwise present through usage of trade under the present section may also be expressly negated by the language of the agreement. Generally, express agreements as to exemptions designed to enlarge upon or supplant the provisions of this section are to be read in the light of mercantile sense and reason, for this section itself sets up the commercial standard for normal and reasonable interpretation and provides a minimum beyond which agreement may not go.
 
 
 [9]
 Force majeure clauses are, of course, limited by those sections of the Code prohibiting agreements which are manifestly unreasonable, in bad faith or unconscionable. See sections 1-102(c), 1-203 and 2-302. See also Eastern Airlines, 532 F.2d at 991 n. 96; Transatlantic Financing Corp. v. United States, 363 F.2d 312, 315 n. 3 (D.C.Cir.1966)
 
 
 [10]
 InterPetrol did not rely on third-party beneficiary concepts at trial and did not attempt to raise the theory on appeal
 
 
 [11]
 See supra note 9
 
 
 [12]
 Our holding is based in part on the fact that Kaiser and InterPetrol were in relatively similar positions in the petroleum market. We have not considered circumstances involving traders from different levels in the hierarchy of the petroleum distribution network. We note too that InterPetrol was not obligated to other buyers to deliver oil it expected to get from Kaiser